# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

CHARLES FRANKLIN MURDOCH, JR.,
          *Petitioner-Appellant,*

          v.

ROY CASTRO, Warden; EDMUND G.
BROWN, JR.,* Attorney General of
the State of California,
          *Respondents-Appellees.*

No. 05-55665

D.C. No.
CV 99-06900
RSWL

OPINION

Appeal from the United States District Court
for the Central District of California
Ronald S.W. Lew, District Judge, Presiding

Argued and Submitted
March 24, 2009—San Francisco, California

Filed June 21, 2010

Before: Alex Kozinski, Chief Judge, Andrew J. Kleinfeld,
A. Wallace Tashima, Sidney R. Thomas, Barry G. Silverman,
M. Margaret McKeown, Kim McLane Wardlaw,
William A. Fletcher, Consuelo M. Callahan, Sandra S. Ikuta,
and N. Randy Smith, Circuit Judges.

Opinion by Judge Tashima;
Concurrence by Judge Silverman;
Dissent by Chief Judge Kozinski;
Dissent by Judge Thomas

   *Edmund G. Brown, Jr., is substituted for his predecessor, Bill Lockyer, as Attorney General of the State of California. Fed.R.App.P. 43(c)(2).

**COUNSEL**

Seymour I. Amster, Van Nuys, California, for the petitioner-appellant.

Rama R. Maline, Deputy Attorney General, Los Angeles, California, for the respondents-appellees.

**OPINION**

TASHIMA, Circuit Judge:

Charles Murdoch was convicted of murder in California state court. Before trial, the prosecutor informed the court that a prosecution witness and participant in the crime had written a letter to his attorney claiming that Murdoch was not involved in the crime and that the witness had been coerced into implicating Murdoch. The state court ruled that Murdoch could not have access to the letter because it was protected under California's attorney-client privilege. In order to determine whether Murdoch is entitled to habeas relief, we must decide whether, under "clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), the Confrontation Clause of the Sixth Amendment of the United States Constitution[1] compelled the release of the letter to Murdoch in spite of the attorney-client privilege.

## I. BACKGROUND[2]

On May 17, 1983, four men robbed the Horseshoe Bar in Long Beach, California. During the course of the robbery, one bystander was shot and killed; another was stabbed and severely wounded. The men recovered approximately $200 from the cash register and left behind a fingerprint. The crime went unsolved until 11 years later, when advances in fingerprint technology enabled police to identify Dino Dinardo as one of the perpetrators.

Officers arrested Dinardo on June 30, 1994, in Berkeley, California. When first questioned, Dinardo denied any

---

[1]"In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. CONST. amend. VI.

[2]The factual and procedural summary is taken largely from *Murdoch v. Castro*, 489 F.3d 1063, 1064-67 (9th Cir. 2007) ("*Murdoch II*").

involvement in the crime, but later recanted, admitting his involvement in the robbery, and identifying Murdoch as one of his accomplices. Both Dinardo and Murdoch were charged with murder accompanied by special circumstances.

Dinardo was tried first. At a suppression hearing that preceded his trial, Dinardo testified that his confession to the Long Beach police had been coerced, and that he had given the confession in exchange for a promise that he would be released to see his wife and daughter. Dinardo was convicted and was sentenced to 25 years' to life imprisonment. At sentencing, the judge said to Dinardo:

> I would like to do something different, Mr. Dinardo. You've probably been told it's a set sentence. I have to give it. The only thing I can say is I have 90 days to change the sentence if anything changes in the way of your mind or the District Attorney's mind insofar as trying to resolve this with something less than the set sentence.
>
> Frankly, from the standpoint of the other trial, unless the District Attorney has something more, I just wonder without your assistance where they're going; but maybe sometimes cases develop at the last minute. But, to my knowledge, I don't know of any other evidence. They have a very difficult case without your assistance.
>
> But that's actually between attorneys, and it's not the judge's province.
>
> I was hoping there would be a resolution so that I could sentence you to something less, which I would prefer to do from everything about this case, especially the length of time and all the years that you lived what appears to be a law-abiding life before you got arrested.

Dinardo subsequently did testify and, in return, received a reduction of his conviction to voluntary manslaughter and a reduced sentence of 12 years' imprisonment.[3]

Dinardo was a key witness at Murdoch's trial. He testified that, in 1983, Murdoch had approached him "to do a job" and that the two of them, together with two other men, robbed the Horseshoe Bar. According to Dinardo, when Murdoch entered

---

[3]The dissent states that "[f]or a judge to goad someone he's just given a life sentence into helping the prosecution by promising to give him his life back, but only if he helps finger the defendant, is judicial extortion." Diss. op. at 9046. What the Chief Judge harshly labels as "judicial extortion" has long been a part of our criminal justice system. *See, e.g.*, U.S.S.G. § 5K1.1 (providing for a downward sentencing departure for substantial assistance in the prosecution of another person); 18 U.S.C. § 3553(f)(5) (providing that a "safety harbor" sentence below a statutory minimum is available only if, *inter alia*, the sentencing court finds that the defendant has fully cooperated with the Government). Perhaps the most famous example of such judicial "goading" or "extortion" is that of Chief Judge Sirica in the *Watergate* trial. There, as reported by *Time* magazine in its 1973 man-of-the-year story, Judge Sirica "kept the pressure on the other convicted conspirators to talk too by giving them harsh provisional sentences ranging up to 40 years. . . . He promised to review the sentences later and said that the final sentencing 'would depend on your full cooperation with the grand jury and the Senate Select Committee.' " *Available at* http://www.time.com/subscriber/personoftheyear/archive/stories/973.html (last visited May 15, 2010).

The dissent characterizes Judge Sirica's conduct of the *Watergate* trial as "unconscionable" and "a blemish on the reputation of the federal courts . . . ." Diss op. at 9046 n.*. The D.C. Circuit, sitting en banc, however, did not express the same, harsh view. It not only affirmed Judge Sirica's conduct, but lauded it in the face of charges that he conducted the trial and sentencing in an inquisitorial manner. *See United States v. McCord*, 509 F.2d 334, 347 (D.C. Cir. 1974) (en banc) ("The judge, like the prosecutor in this respect, is not a passive by-stander in the arena of justice, a spectator at a 'sporting event,' rather he or she has the most pressing affirmative responsibility to see that justice is done in every case." (footnotes omitted)), *cert. denied*, 421 U.S. 930 (1975); *see also United States v. Liddy*, 509 F.2d 428, 442 (D.C. Cir. 1974) ("Judge Sirica's palpable search for truth in such a trial was not only permissible, it was in the highest tradition of his office as a federal judge.").

the bar, Murdoch carried a .22 caliber rifle and announced loudly, "Don't nobody move. This is a stick-up." Dinardo took this as his cue to empty the cash register. He fumbled with the buttons on the register, heard a gunshot, emptied the register, and ran out the back door, joining the other two men in the getaway car, with Murdoch joining them about a minute later. He recalled seeing Murdoch in possession of the rifle both in the bar and in the car. Dinardo testified that the first time he learned that someone had been shot in the robbery was the day of his arrest, 11 years after the crime.

During Murdoch's trial, Murdoch's attorney, Dinardo's attorney, the prosecutor, and the presiding judge discussed a letter from Dinardo addressed to his then counsel. The letter was first brought to the court's attention by the prosecutor, who indicated that in her interviews of Dinardo, he told her of the existence of a letter in which he, Dinardo, stated that he was coerced by the police into implicating Murdoch in the crime. Dinardo's new counsel asserted the attorney-client privilege and work-product doctrine as grounds for refusing to disclose the letter. The court concluded that Dinardo's letter to Dinardo's former counsel, who was still representing Dinardo when the letter was written, was protected by the attorney-client privilege and thus could not be used, on cross-examination, to impeach Dinardo.

Although Dinardo was not cross-examined about the letter, Murdoch's counsel succeeded in eliciting testimony that challenged Dinardo's credibility as a witness. Dinardo testified that he had been convicted of the same murder for which Murdoch was now being tried and that by testifying in Murdoch's trial, he would "get out in about five years" rather than 21 or more years. He admitted that when he was initially questioned by the police, he had lied and denied that he had ever been inside the Horseshoe Bar. He admitted that he would have done "whatever it took" to get out of custody and be reunited with his daughter. He also testified to convictions for grand theft in 1982 and petty theft in 1984. On re-direct

examination by the prosecutor, Dinardo testified that during the police questioning, he named a "Charles or Chuck" as someone else involved in the crime, but he could not remember the last name. He was shown photographs at the end of the interview, and he identified Murdoch as one of his accomplices. On re-cross, he stated that he had testified in his own trial that his confession had been coerced. He also admitted that, had the fingerprints not identified him as one of the robbers, he would have continued to lie to the police about his involvement.

In addition to Dinardo, other witnesses from the Horeshoe Bar testified and provided in-court identification of Murdoch. The bartender, Dyanne Spence, described looking into Murdoch's eyes down the barrel of a rifle pointed at her face. "He's been scaring me for years," she said. She also testified that she had identified Murdoch at a live lineup at the county jail in 1994 and that she was sure "beyond a shadow of a doubt" that Murdoch had committed the crime.

Murdoch was convicted of first-degree murder with a robbery-murder special circumstance, and sentenced to life imprisonment without parole. The California Court of Appeal affirmed the conviction, and denied Murdoch's petition for a writ of habeas corpus. The California Supreme Court denied Murdoch's petition for review.

Murdoch then filed a federal petition for a writ of habeas corpus, which the district court dismissed. On Murdoch's first appeal, we vacated the order denying Murdoch's habeas petition and remanded the case to the district court stating:

> Today, we address a situation where a substantial showing has been made that, depending upon the content of Dinardo's letter, the Confrontation Clause and attorney-client privilege are potentially at odds —a set of facts the Supreme Court has not yet examined. Its precedents, however, clearly provide that

evidentiary privileges or other state laws must yield
if necessary to ensure the level of cross-examination
demanded by the Sixth Amendment.

*Murdoch v. Castro*, 365 F.3d 699, 702 (9th Cir. 2004)
("*Murdoch I*"). We concluded that if the contents of Dinardo's letter "are as generally described by the prosecutor and as Murdoch believes," then Murdoch "has arguably met his burden" of showing that the jury might have received a significantly different impression of the witness' credibility had Murdoch been able to pursue his proposed line of cross-examination. *Id.* at 705. General impeachment for bias implicated Dinardo's reliability to a lesser extent than actual statements inconsistent with his testimony, such as those which the letter purportedly contained. *Id.* Without knowing the contents of the letter, however, we could not make a determination of whether Murdoch's confrontation rights had been violated. We accordingly remanded the case to the district court with instructions that the court obtain the letter, inspect it in camera, and determine whether the state court's decision to deny Murdoch access to the letter violated Murdoch's Sixth Amendment right of confrontation. *Id.* at 706.

On remand, the magistrate judge, in his report and recommendation, began from the premise that "[e]ssentially, the Ninth Circuit held that the attorney-client privilege might have to yield in a particular case if the right of confrontation would be violated by enforcing the privilege." The report concluded that, although the state courts had read the contents of the letter, their decisions were "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," within the meaning of 28 U.S.C. § 2254(d)(1), in that they failed to perform any balancing of Murdoch's Sixth Amendment rights against the privilege.

Nevertheless, the report found that there was no constitutional violation because the letter's intrinsic probative value

was low, given that, of the four factual assertions in the letter, "trial testimony rebutted the first three, and half of the fourth." The magistrate judge summarized the contents of the letter as asserting the following facts: (1) After Dinardo's arrest in Berkeley, Long Beach Police Detective Pavek coerced a statement from Dinardo by promising not to charge Dinardo in exchange for Dinardo's statement; (2) In his statement, Dinardo was forced to identify petitioner Murdoch as a participant in the crime; (3) Dinardo does not actually know Murdoch, although Dinardo is acquainted with Murdoch's brother; and (4) Murdoch and Dinardo did not commit any crime.

Because the factual assertions in the letter had been "contradicted by trial testimony" or "were demonstrably false in the light of other testimony," the magistrate judge found that the "intrinsic probative value of the letter was and is low." Thus, the exclusion of the letter from evidence did not substantially diminish Murdoch's right to effective cross-examination. The magistrate judge also concluded that the decision to exclude the letter was subject to harmless error analysis, and, further concluded, under the *Brecht v. Abrahamson* standard, 507 U.S. 619, 637 (1993), that there was no "grave doubt" as to whether the jury would have reached a different result had the letter been admitted. While acknowledging that "Dinardo's testimony was crucial," the magistrate judge found that "Dinardo's prior inconsistent statement was inextricably linked with other statements which either conflicted with other evidence or were demonstrably false." Therefore, he concluded that any error resulting from the exclusion of the letter was harmless. The district court adopted the magistrate judge's findings and recommendation and denied Murdoch's habeas petition.

On Murdoch's second appeal, a divided three-judge panel affirmed the district court's denial of habeas relief in *Murdoch II*, 489 F.3d 1063. The majority pointed out that it was bound under the "law of the case" doctrine by the *Murdoch*

*I* court's holding that, "under the right set of facts, Supreme Court precedent suggests the Sixth Amendment right to confrontation could support admission of the letter, even against a valid claim of attorney-client privilege." *Id.* at 1068. Although the *Murdoch I* court had not explicitly held that it was clearly established under Supreme Court law that the Confrontation Clause might support the introduction of the letter as evidence, the majority in *Murdoch II* interpreted this as a necessary implication of *Murdoch I* that was binding on the panel as the law of the case. *Id.* at 1068 & n.2. The panel then held that Murdoch was able to cross-examine Dinardo effectively in spite of not having access to the letter, and that therefore the Sixth Amendment did not require that the letter be released to him. *Id.* at 1069-70.

Judge Bright[4] dissented from the panel's decision. He believed that access to the letter would have allowed Murdoch to impeach Dinardo's testimony much more effectively than was possible without the letter, and that, on the basis of *Murdoch I*, habeas relief should have been granted. *Id.* at 1070-72 (Bright, J., dissenting).

We granted Murdoch's petition for rehearing en banc.[5] *Murdoch v. Castro*, 546 F.3d 1051 (9th Cir. 2008).

## II.  JURISDICTION AND STANDARD OF REVIEW

We review de novo the district court's denial of a § 2254 habeas petition. *Tilcock v. Budge*, 538 F.3d 1138, 1143 (9th Cir. 2008). Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a habeas petition challenging a state court conviction will not be granted unless the decision

---

[4]The Honorable Myron H. Bright, Senior United States Circuit Judge for the Eighth Circuit, sitting by designation, was a member of the *Murdoch II* panel.

[5]The en banc court ordered supplemental briefing on the question of whether the court should reconsider its decision in *Murdoch I*.

"was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). Here, AEDPA applies because the state court denied Murdoch's claim "on the merits," rather than on a procedural or other ground. 28 U.S.C. § 2254(d)(1); *see Lambert v. Blodgett*, 393 F.3d 943, 969 (9th Cir. 2004); *Reynoso v. Giurbino*, 462 F.3d 1099, 1109 (9th Cir. 2006) (assuming, unless it is otherwise "clear," that a state court has decided all the issues presented); *Hunter v. Aispuro*, 982 F.2d 344, 346-48 (9th Cir. 1992) (presuming denial of habeas relief is on the merits, not procedural grounds, unless the decision supports the opposite conclusion). Under § 2254(d), we cannot grant the writ unless the state court's decision (denying Murdoch's claim) is objectively unreasonable. *See Delgado v. Lewis*, 223 F.3d 976, 982 (9th Cir. 2000); *Pirtle v. Morgan*, 313 F.3d 1160, 1165, 1169 (9th Cir. 2002).

## III. DISCUSSION

[1] The Confrontation Clause of the Sixth Amendment guarantees a defendant in a criminal case an opportunity for effective cross-examination of the witnesses against him. *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986). In *Murdoch I*, we implicitly held that it was clearly established by the Supreme Court that this right could, in some circumstances, be violated by the failure to produce a document that was otherwise protected by the attorney-client privilege. 365 F.3d at 705-06. The three-judge panel in *Murdoch II* was bound under the "law of the case" doctrine by *Murdoch I*'s holding. *See Murdoch II*, 489 F.3d at 1067-68. This restriction, however, does not apply to the en banc court. *See Kyocera Corp. v. Prudential-Bache Trade Servs., Inc.*, 341 F.3d 987, 995 (9th Cir. 2003) (en banc). The question we must now confront, therefore, is whether *Murdoch I* was correct in holding that it is clearly established by Supreme Court precedent that the Sixth Amendment right to confrontation in some situations trumps the attorney-client privilege.

## A

The Supreme Court has restricted "clearly established Federal law" under § 2254(d)(1) to " 'the holdings, as opposed to the dicta, of this Court's decisions as of the time of the relevant state-court decision.' " *Carey v. Musladin*, 549 U.S. 70, 74 (2006) ("*Musladin II*") (quoting *Williams v. Taylor*, 529 U.S. 362, 412 (2000)). A state court's decision is contrary to clearly established law when it either "applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or "confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent." *Williams*, 529 U.S. at 405-406. A state court unreasonably applies clearly established law when it "identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003) (quoting *Williams*, 529 U.S. at 413). To be an unreasonable application, the state court decision "must be objectively unreasonable," not just incorrect or erroneous. *Id.* at 75-76. Habeas relief for an unreasonable application of law can be "based on the application of a governing legal principle to a set of facts different from those of the case in which the principle was announced. *Id.* at 76.[6] Habeas relief for an unreasonable appli-

---

[6]The California Court of Appeal, which rendered the last reasoned state court decision in this case, addressed Murdoch's Confrontation Clause argument only obliquely. It did not mention the Confrontation Clause in its opinion, but it did discuss and quote from the section of Murdoch's brief in which he raised the issue. The court also quoted from *People v. Godlewski*, 21 Cal. Rptr. 2d 796, 800 (Ct. App. 1993), a case that dealt with the tension between the attorney-client privilege and the Confrontation Clause. Whether the state court adequately responded to Murdoch's Confrontation Clause argument, however, is irrelevant. Even when there is no reasoned state court opinion explaining the denial of a defendant's claim in any respect, we "must assume that the state court has decided all the issues and 'perform an independent review of the record to ascertain whether the state court decision was objectively reasonable.' " *Reynoso*,

cation of law can be "based on an application of a governing legal principle to a set of facts different from those of the case in which the principle was announced." *Id.*; *accord Panetti v. Quarterman*, 127 S. Ct. 2842, 2858 (2007), but only when the principle "clearly extend[s]" to the new set of facts. *Wright v. Van Patten*, 128 S. Ct. 743, 745 (2008) (per curiam).

A review of the Supreme Court's recent case law on this subject suggests that, when a state court may draw a principled distinction between the case before it and Supreme Court caselaw, the law is not clearly established for the state-court case. In *Musladin II*, 549 U.S. at 77, the Supreme Court vacated a decision of this court, *Musladin v. Lamarque*, 427 F.3d 653, 661 (9th Cir. 2005) ("*Musladin I*"), in which this court held that the state court unreasonably applied clearly established federal law by allowing the victim's family members, in a murder trial, to wear buttons depicting the victim while in the presence of the jury.

In support of our decision in *Musladin I*, we relied primarily on two Supreme Court cases: *Estelle v. Williams,* 425 U.S. 501 (1976), and *Holbrook v. Flynn*, 475 U.S. 560 (1986). In *Williams*, the Court noted that, when a defendant appears before the jury in prison garb, "[t]he defendant's clothing is so likely to be a continuing influence throughout the trial that

---

461 F.3d at 1109 (quoting *Pham v. Terhune*, 400 F.3d 740, 742 (9th Cir. 2005) (per curiam)) (internal quotation marks omitted). Thus we do not review Murdoch's claim de novo, as we would if the state court had clearly indicated that it had not reached the merits of Murdoch's claim. *See id.*; *Pirtle*, 313 F.3d at 1167.

The dissent refuses to accept these established principles of AEDPA review. Instead, it spends several pages discussing the state appellate court's duty under state law to "analyze[ ] . . . [each] contention" and convinces itself that the state court erroneously "decline[d] to reach [the] issue" and "overlooked" it. *See* Diss. op. at 9050-52. But whether we review a claim de novo under the AEDPA is a question of federal law and, on that question, as explained above, we are bound by *Reynoso* and *Pirtle*.

. . . an unacceptable risk is presented of impermissible factors coming into play." 425 U.S. at 505. Thus, a defendant's right to a fair trial is violated if he is required to appear in the presence of the jury in such attire. *Id.* at 505-06. The Court reaffirmed this basic position in *Flynn*, but held that the presence of extra security personnel in the courtroom during trial did not necessarily violate the defendant's Sixth and Fourteenth Amendment rights because, unlike the situation described in *Williams*, it was not "inherently prejudicial." *Flynn*, 475 U.S. at 569. Although the presence of additional security in the courtroom might violate a defendant's right to a fair trial in a particular case, Flynn's trial, in which four uniformed state troopers sat silently in the first row of the spectator section, did not present such a case. *Id.* at 569-72. In *Musladin I*, we held that the presence of the victim's family in the courtroom while wearing buttons was inherently prejudicial, and was an unreasonable application of the test described in *Williams* and *Flynn*. *Musladin I*, 427 F.3d at 658-61.

When the Supreme Court vacated our grant of habeas relief in *Musladin I*, it pointed out that "[b]oth *Williams* and *Flynn* dealt with government-sponsored practices." *Musladin II*, 549 U.S. at 75. No Supreme Court case had applied *Williams* and *Flynn* to courtroom conduct by private actors, and, because part of the test established in *Williams* and *Flynn* asked "whether the [allegedly prejudicial] practices furthered an essential *state* interest," it was not clearly established that the test would apply to actions by private actors. *Id.* at 76. The Court summarized its reasoning as follows:

> Given the lack of holdings from this Court regarding the potentially prejudicial effect of spectators' courtroom conduct of the kind involved here, it cannot be said that the state court "unreasonabl[y] appli[ed] clearly established Federal law." § 2254(d)(1). No holding of this Court required the California Court of Appeal to apply the test of *Williams* and *Flynn* to the spectators' conduct here.

> Therefore, the state court's decision was not contrary to or an unreasonable application of clearly established federal law.

*Id.* at 77 (emendations in original).

Similarly, in *Van Patten*, the Court held that it was not clearly established that a defendant received ineffective assistance of counsel if his lawyer represented him via speakerphone, rather than by being physically present in the courtroom. 128 S. Ct. at 746-47. The Seventh Circuit had granted habeas relief on the basis of *United States v. Cronic*, 466 U.S. 648 (1984), which held that in certain circumstances a defendant need not prove that he was actually prejudiced by his attorney's conduct. The logic of *Cronic* is that, in some situations, "the likelihood that any lawyer, even a fully competent one, could provide effective assistance is so small that a presumption of prejudice is appropriate without inquiry into the actual conduct of the trial." *Id.* at 659-60. One situation in which *Cronic* applies is when "counsel [is] either totally absent, or prevented from assisting the accused during a critical stage of the proceeding." *Id.* at 659 n.25. The Court reversed the Seventh Circuit because *Cronic* did not clearly apply to the facts at hand. *Van Patten*, 128 S. Ct. at 746. Although an attorney who participated in a hearing telephonically might not do as well as one who was physically present in the courtroom, the state court could reasonably believe that the attorney's performance would not be so poor as to justify relief without showing prejudice: "Our cases provide no categorical answer to this question." *Id.*

In *Panetti*, 127 S. Ct. 2842, by contrast, there was no principled way to apply the Court's precedent to a somewhat new factual situation and reach the state court's result; thus, the Court granted habeas relief. *Panetti* concerned the pending execution of person with a history of mental illness. 127 S. Ct. 2848-49. The Court identified the controlling legal principle as the holding of *Ford v. Wainwright*, 477 U.S. 399 (1986),

which required that a prisoner who has made "a substantial threshold showing of insanity" be given a competency hearing before being subject to execution. *Id.* at 426 (Powell, J., concurring in part and concurring in the judgment).[7] The Court held that it was clearly established that *Ford* required a competency hearing with procedural protections for the prisoner, even though the standard in *Ford* was stated in general terms and the facts were not identical to those with which it was now faced. *Panetti*, 127 S. Ct. at 2858-59. There was no reasonable way to apply *Ford* that would not reach this result, and thus the state court had unreasonably applied the law when it failed to provide Panetti with a proper competency hearing. *Id.* at 2858.

**[2]** The common thread in all these cases is that when there is a principled reason for the state court to distinguish between the case before it and Supreme Court precedent, the state court's decision will not be an unreasonable application of clearly established Supreme Court law. As we stated in *Moses v. Payne*, 555 F.3d 742 (9th Cir. 2009):

> [W]hen a Supreme Court decision does not "squarely address[ ] the issue in th[e] case" or establish a legal principle that "clearly extend[s]" to a new context to the extent required by the Supreme Court in these recent decisions, it cannot be said, under AEDPA, there is "clearly established" Supreme Court precedent addressing the issue before us, and so we must defer to the state court's decision.

*Id.* at 754 (emendations in original) (quoting *Van Patten*, 128 S. Ct. at 746, 745).

---

[7]Because Justice Powell's opinion represented the narrowest ground on which five Justices agreed, the *Panetti* court recognized it as the controlling opinion. 127 S. Ct. at 2856.

**B**

**[3]** The Supreme Court has examined the potential conflicts between the Confrontation Clause and other rights and privileges, including the marital privilege, *Crawford v. Washington*, 541 U.S. 36 (2004),**[8]** the Fifth Amendment privilege against self-incrimination, *Douglas v. Alabama*, 380 U.S. 415 (1965), and the state's interest in the confidentiality of adjudications of juvenile delinquency, *Davis v. Alaska*, 415 U.S. 308 (1974). But no Supreme Court case has directly addressed the potential conflict between state-law attorney-client privilege and the Confrontation Clause, as we acknowledged in *Murdoch I.* 365 F.3d at 702 ("Today, we address a situation where a substantial showing has been made that, depending upon the content of Dinardo's letter, the Confrontation Clause and attorney-client privilege are potentially at odds—*a set of facts the Supreme Court has not yet examined*.") (emphasis added). Indeed, in a case involving the attorney-client privilege, the Supreme Court has expressly stated that it would not consider the question whether the attorney-client privilege might yield in the face of constitutional rights. *Swidler & Berlin v. United States*, 524 U.S. 399, 408 n.3 (1998).

In *Swidler*, the Supreme Court addressed the scope of the attorney-client privilege — specifically, "the extent to which the privilege survives the death of the client." *Id.* at 403. The Independent Counsel sought notes taken by an attorney during a meeting with his client, former Deputy White House Counsel Vincent Foster. Foster sought legal representation, but, shortly after the meeting, he committed suicide. *Id.* at 401-02. The Independent Counsel argued that "the attorney-client privilege should not prevent disclosure of confidential com-

---

**[8]***Crawford* was decided after Murdoch's conviction became final and does not apply retroactively on collateral review. *See Whorton v. Brockting*, 549 U.S. 406 (2007). Thus, whether the Supreme Court in *Crawford* explained "what the Sixth Amendment was supposed to prevent," Diss. op. at 9056, is irrelevant to our review under the AEDPA.

munications where the client has died and the information is relevant to a criminal proceeding." *Id.* at 403.

The Court began by discussing the purpose of the privilege, "to encourage 'full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and the administration of justice.' " *Id.* (quoting *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981)). The Independent Counsel analogized the situation to the testamentary exception to the attorney-client privilege, arguing that "in criminal proceedings, the interest in determining whether a crime has been committed should trump client confidentiality." *Id.* at 406. The Court disagreed, stating that, unlike with the testamentary exception, "[t]here is no reason to suppose as a general matter that grand jury testimony about confidential communications furthers the client's intent." *Id.* As pertinent here, the Court further reasoned that "there is no case authority for the proposition that the privilege applies differently in criminal and civil cases." *Id.* at 408-09. Significantly, the Court noted that, "Petitioners, while opposing wholesale abrogation of the privilege in criminal cases, concede that exceptional circumstances implicating a criminal defendant's constitutional rights might warrant breaching the privilege," but the Court stated that "*[w]e do not . . . need to reach this issue*, since such exceptional circumstances clearly are not presented here." *Id.* at 408 n.3 (emphasis added).

**[4]** The Supreme Court accordingly has explicitly stated that it was not deciding whether the attorney-client privilege might have to yield to a criminal defendant's constitutional rights. We have held that a constitutional principle is not clearly established for purposes of § 2254 where the Supreme Court has expressly concluded that an issue is an "open question." *Earp v. Ornoski*, 431 F.3d 1158, 1185 (9th Cir. 2005); *see also Mejia v. Garcia*, 534 F.3d 1036, 1046 (9th Cir. 2008) (holding that the Supreme Court had not clearly established, for purposes of § 2254, that the admission of propensity evi-

dence in that case was unconstitutional because the Supreme Court had expressed no opinion on the issue and the petitioner accordingly could "point to no Supreme Court precedent" establishing the constitutional right); *Larson v. Palmateer*, 515 F.3d 1057, 1066 (9th Cir. 2008) ("Because the Court has expressly left this issue an open question, the state court did not unreasonably apply clearly established federal law in determining that the admission of evidence of Larson's criminal history did not violate due process." (internal quotation marks omitted)).

The Eighth Circuit has relied on the Supreme Court's express reservation of the issue in *Swidler* to hold that the issue is not clearly established for purposes of § 2254. In *Newton v. Kemna*, 354 F.3d 776 (8th Cir. 2004), the state trial court denied the defendant's motion to produce the only eyewitness' medical records. The Eighth Circuit "note[d] that the Supreme Court has recognized in other circumstances that constitutional rights can trump evidentiary privileges," citing *Davis* and *Swidler*. *Id.* at 781. The court stated, however, that *Swidler* "expressly left open the question of whether a criminal defendant's constitutional rights might overcome the attorney-client privilege," and therefore concluded that the Supreme Court had not clearly established whether a state's "physician-patient privilege must give way to a defendant's desire to use psychiatric records in cross-examination." *Id.* at 781, 782; *see also Johnson v. Norris*, 537 F.3d 840, 846-47 (8th Cir. 2008) (discussing *Newton* and *Swidler* and concluding that, although *Davis* and *Pennsylvania v. Ritchie*, 480 U.S. 39 (1987), "establish that in at least some circumstances, an accused's constitutional rights are paramount to a State's interest in protecting confidential information," those cases "do not establish a specific legal rule that answers whether a State's psychotherapist-patient privilege must yield to an accused's desire to use confidential information in defense of a criminal case"). As the Eighth Circuit reasoned in *Newton*, "[g]iven the restrictive nature of habeas review, it is not our province to speculate as to whether the Supreme Court, if

faced with the issue, would find that [a state's] physician-patient privilege must give way to a defendant's desire to use [privileged material] in cross-examination." *Newton*, 354 F.3d at 782.

It is not mere formalism to distinguish between attorney-client privilege and other rights and privileges the Court has dealt with in its Confrontation Clause jurisprudence. The attorney-client privilege is, after all, "one of the oldest recognized privileges for confidential communications," *Swidler*, 524 U.S. at 403. The Supreme Court might well decide that it is worthy of greater protection than the marital privilege, *see Crawford v. Washington*, 541 U.S. 36, or the confidentiality of juvenile delinquency proceedings, *see Davis v. Alaska*, 415 U.S. 308. In addition, the Court might be more likely to protect documents subject to attorney-client privilege because it is easier to maintain such protection without eliminating the defendant's ability effectively to cross-examine a witness. Because the attorney-client privilege protects only a communication between an attorney and a client, not the facts that are communicated, a defendant would remain free to question the witness about the underlying facts, just as happened here. Despite not having access to the letter, Murdoch was able to cross-examine Dinardo on a wide range of subjects, including Dinardo's earlier denial of involvement in the murder. As the Supreme Court has explained, the attorney-client privilege does not "create a broad 'zone of silence' over" the subject matter of the communication. "The privilege only protects disclosure of [the] communications [themselves]; it does not protect disclosure of the underlying facts," so long as the underlying facts can be proven without resort to the privileged materials. *Upjohn*, 449 U.S. at 395.

In *Crawford*, by contrast, the marital privilege prevented the defendant from cross-examining the witness at all. *See* 541 U.S. at 40. The same was true in *Douglas v. Alabama*, 380 U.S. at 416-17, when the witness asserted his Fifth Amendment privilege against self-incrimination.

**[5]** We acknowledge the possibility that the Supreme Court may in the future well decide that the Confrontation Clause in some cases requires the disclosure of documents that are subject to the attorney-client privilege. But under the highly deferential standard established by AEDPA and the Supreme Court, as long as the state court could have found a principled reason not to apply the Court's precedents to the current case, we may not grant habeas relief. As was the case in *Musladin II*, 549 U.S. at 77, "[n]o holding of th[e Supreme] Court required the California Court of Appeal to apply" cases such as *Douglas* and *Davis* to Murdoch. The relationship between the Confrontation Clause and the attorney-client privilege has not been clearly established by the Supreme Court; as a result, we cannot say that the California court unreasonably applied clearly established Supreme Court law to Murdoch's case.[9]

## IV. CONCLUSION

**[6]** Because the Supreme Court has not clearly established whether and in what circumstances the attorney-client privilege must give way in order to protect a defendant's Sixth Amendment confrontation rights, the California state court could not have unreasonably applied clearly established Supreme Court law when it denied Murdoch access to the let-

---

[9]The concurrence faults Murdoch because his counsel "*only* sought disclosure of the letter Dinardo had written to his lawyer," and did not move to strike Dinardo's testimony. Concur. op. at 9044-45. It assumes that the *exclusive* procedure for preserving a Sixth Amendment confrontation claim is a motion to strike the challenged testimony, but cites no case so holding. Instead, the authorities on which Judge Silverman relies state only what is "ordinarily . . . appropriate," or that a defendant is "entitled" to have the testimony stricken, or what "many judges . . . agree." *Id.* at 9044-45. Because Judge Silverman agrees that Murdoch "unquestionably perfected his objection to the court's denial of the disclosure request," *id.* at 9045, we agree with Chief Judge Kozinski that, because "California is satisfied with the procedural posture of this case, [w]e are in no position to disagree." Diss. op. at 9067.

ter. *See Musladin II*, 549 U.S. at 77. To the extent that it holds to the contrary, *Murdoch I* is overruled.

For the reasons set forth above, the judgment of the district court is **AFFIRMED.**

---

SILVERMAN, Circuit Judge, concurring:

This case is built on a false premise — that there was somehow a conflict between Dinardo's right to claim the attorney-client privilege under California law and Murdoch's federal constitutional right of confrontation. There was no conflict. The trial court could have sustained Dinardo's claim of privilege, and then having done so, stricken Dinardo's direct testimony on the ground that Murdoch could not be effectively cross-examined. This is a very common scenario when a witness testifies on direct but then cannot be cross-examined. *See Toolate v. Borg*, 828 F.2d 571, 572 (9th Cir. 1987) ("Ordinarily, when a testifying witness cannot or will not be cross-examined, the appropriate relief . . . is to strike the direct testimony of the witness and to instruct the jury to disregard it.") (internal quotation marks omitted); *United States v. Brown*, 634 F.2d 819, 824 (5th Cir. 1981) (stating that while "it is by no means clear that the appropriate resolution to a conflict between [the confrontation] right and the marital privilege is the actual introduction of the testimony" a defendant is entitled "to strike that portion of the testimony of the witnesses against him with regard to which his right of confrontation is lost"); 1 Kenneth S. Broun, et al., *McCormick on Evidence* § 19 (6th ed. 2006) (stating that "many judges and writers" agree that excluding the direct testimony is the proper remedy when a witness cannot be properly cross-examined).

The problem is that Murdoch's counsel *only* sought disclosure of the letter Dinardo had written to his lawyer, deputy

public defender Star. When the trial court sustained the claim of attorney-client privilege, that's where Murdoch's lawyer was content to leave it. His lawyer unquestionably perfected his objection to the court's denial of the disclosure request, but never sought to strike Dinardo's testimony. This is the remedy that the law provides in the case of a witness who cannot be cross-examined for *any* reason. If the direct testimony cannot be tested by cross-examination, it cannot stand and is stricken.

Had the trial court denied a motion to strike Dinardo's testimony, we would have a legitimate confrontation problem on our hands, but no such motion was ever made. Thus, it cannot be said that the state court denied Murdoch's confrontation right at all, much less that it acted unreasonably or contrary to clearly established Supreme Court law. In the absence of a constitutional violation, federal habeas corpus relief cannot be granted. 28 U.S.C. § 2254(a), (d).

For these reasons, I would affirm the denial of habeas relief.

---

Chief Judge KOZINSKI, dissenting, with whom Judges W. Fletcher and Wardlaw join, and Judges Thomas and McKeown join with respect to Parts 2 and 3:

If it wasn't for bad luck, Murdoch wouldn't have no luck at all. He's wakin' up this mornin' in jail when there's strong proof he ain't done nothing wrong. I would certainly defer to a jury's contrary verdict if it had seen this evidence and convicted Murdoch after a fair trial, presided over by a fair judge, followed by an appeal where the justices considered all of his constitutional claims. But Murdoch had none of these.

Start with the trial judge: He was so worried that the prosecution couldn't put on sufficient evidence to convict Murdoch

that he sentenced Murdoch's alleged confederate (Dinardo) to life in prison, but promised to give him a big break if he testified against Murdoch. True to his word, right after Dinardo fingered Murdoch, and as Murdoch's jury was retiring to deliberate, the judge rewarded Dinardo by reducing his life sentence to a walk-away twelve years—or, as Dinardo himself estimated, actual time served of about five years.

Put yourself in Dinardo's shoes: You've just been sentenced to spend the rest of your days behind bars, never again to hold your infant daughter in your arms. But the judge immediately dangles the promise of leaving prison and resuming a normal life before she turns eight, if only you help nail Murdoch. Prosecutors are known to offer defendants a break if they testify truthfully against a co-defendant. For a judge to goad someone he's just given a life sentence into helping the prosecution by promising to give him his life back, but only if he helps finger the defendant, is judicial extortion.* You'd

---

*I didn't coin the term; it comes from Philip Kurland, probably the pre-eminent constitutional scholar at the time of Watergate, who referred to Chief Judge Sirica's similar misconduct as "a form of extortion." Man of the Year: Judge John J. Sirica, *Time*, Jan. 7, 1974. James Fellers, then the ABA's President-Elect, likened Judge Sirica's treatment of the Watergate defendants to the "torture rack and the Spanish Inquisition." *Id.* Dean Monroe Freedman of Hofstra Law School argued that "Sirica deserves to be censured for becoming the prosecutor himself." *Id.*

Sirica's unconscionable conduct is a blemish on the reputation of the federal courts. While covering him with wet warm kisses as to his other questionable conduct, the D.C. Circuit stopped short of approving Sirica's blackjacking of the defendants. *United States* v. *McCord*, 509 F.2d 334, 346 n.35 (D.C. Cir. 1974) (en banc). No one, until today, has. Even the trial judge in Murdoch and Dinardo's cases recognized a judge shouldn't act this way. *See* p. 9063 *infra*. We've said as much in the past: "[J]udicial involvement in plea negotiations inevitably carries with it the high and unacceptable risk of coercing a defendant to accept the proposed agreement," and that "violate[s] a defendant's fundamental constitutional rights." *United States* v. *Bruce*, 976 F.2d 552, 556 (9th Cir. 1992). "[C]ourts must not use the sentencing power as a carrot and stick . . . and they must not create an appearance of such a practice." *United States* v. *Stockwell*, 472 F.2d 1186, 1187 (9th Cir. 1973). One wonders whether these cases survive today.

have to be more than human not to do or say whatever it takes to grab that brass ring.

Not only did the trial judge strong-arm Dinardo into testifying, he prevented the defense from seeing—and so from using for cross-examination—a letter Dinardo had written a year earlier exculpating Murdoch and disclosing that the police had coerced Dinardo into making false accusations. The letter, written by Dinardo's own hand on notebook paper, is still under seal, protected by Dinardo's vestigial attorney-client privilege, but Judge Bright's reconstruction is a fair summary:

> I would like to make a statement about the facts surrounding my arrest for robbery and murder. I was taking care of my young daughter when Long Beach police arrested me at my home in Berkeley. Two policemen, Detective Pavek and his partner, took me to the Berkeley Police Department and interviewed me. I wanted to get back to my daughter as I worried about her welfare. At that time, Detective Pavek coerced a statement from me and promised not to charge me if I made a statement that Charles Murdoch participated in the crime. But, I do not actually know Mr. Murdoch, although I know his brother. Mr. Murdoch and I did not commit any crime.

*Murdoch* v. *Castro*, 489 F.3d 1063, 1071 (9th Cir. 2007) (Bright, J., dissenting).

This letter would have destroyed Dinardo as a witness, so the trial judge suppressed it. After all, what's the point of putting the screws on Dinardo only to have his testimony decimated by his contrary prior statement? So the defense never got to see the letter and the jury never heard of it, despite cases from the state court of appeal and the state supreme court squarely holding Murdoch was entitled to the letter.

You'd think that, with all that controlling authority on point, the state appellate court would have reversed the con-

viction. But you'd be wrong. Judges can only reverse a conviction if they consider the defendant's winning argument. Here, the court of appeal, for reasons that can be explained only one way, *see* pp. 9050-52 *infra*, did not. It's not like the court summarily affirmed the conviction; it spent thirty pages going over Murdoch's other arguments and knocking them down like bowling pins. But Murdoch's best argument—the one for which the government had *no* answer—the state appellate judges just skipped over as if he never made it. This is passing strange, but it's what happened.

Now, to complete Murdoch's run of ill luck, a plurality of our panel grants deference to a non-existent state-court "adjudication" of his winning claim and concludes that the state courts were not unreasonable in holding what they in fact never held. And, even though a majority of the en banc panel agrees that Murdoch was denied his right to confrontation, our concurring colleague denies relief based on a procedural default argument that the state has never made. If everybody went to heaven, I do believe poor Murdoch would miss the call.

**1. AEDPA Deference.** The plurality holds that the state courts adjudicated Murdoch's Confrontation Clause claim on the merits, so we must defer under AEDPA. Pl. op. 9032-33 & n.5. That's contrary to the facts, because the last reasoned decision of the state courts contains not a single word about the Confrontation Clause; it's contrary to the concerns of comity and federalism that motivated AEDPA, because the state courts have interpreted the Confrontation Clause as Murdoch suggests; and it's contrary to the very essence of habeas review, because no court will ever actually decide Murdoch's constitutional claim on the merits (unless lightning strikes and the Supreme Court intervenes).

**a.** Murdoch argued to the state courts that his Sixth Amendment right to confrontation was violated when Dinardo was allowed to testify, but could not be cross-examined about a

letter he wrote exculpating Murdoch. Over the course of nearly twenty pages, Murdoch argued to the state court of appeal that "while the attorney-client privilege is entitled to great deference, the privilege must nonetheless yield when it clashes with more compelling Sixth Amendment rights of a criminal defendant to confrontation and cross-examination." Opening Brief at 125, *People* v. *Murdoch*, No. NA020621 (Cal. Ct. App. May 22, 1997). He also argued that, if the privilege couldn't be forced to yield, "the constitutionally mandated solution to the dilemma *is to exclude the witness' testimony*." *Id.* at 137 (emphasis in original). In other words, Murdoch argued that either he should have been allowed to cross-examine Dinardo about the letter, or Dinardo's testimony should have been excluded. These arguments were backed up by plenty of citations to federal cases like *Douglas* v. *Alabama*, 380 U.S. 415 (1965), *and Davis* v. *Alaska*, 415 U.S. 308 (1974). And they were slam-dunks under California cases like *Vela* v. *Superior Court*, 208 Cal. App. 3d 141 (Ct. App. 1989), and *People* v. *Mincey*, 2 Cal.4th 408 (1992), both of which held that the Sixth Amendment right to confrontation supersedes the attorney-client privilege.

Murdoch took his appeal to the same court of appeal that decided *Vela*, and his case was assigned to the very same division of that court. He opened his Confrontation Clause argument by citing *Vela*, and he even had two of the *Vela* justices on his panel. Yet they did not discuss Murdoch's Confrontation Clause claim or distinguish *Vela* and *Mincey*. They simply ignored the issue, devoting not a single word to it over the course of a detailed thirty-page opinion that decided every one of Murdoch's other claims. The court of appeal's discussions of Murdoch's claims under the Fourth and Fourteenth Amendments consume almost seven pages. *People* v. *Murdoch*, No. NA20621, slip op. at 6-10, 19-20 (Cal. Ct. App. Mar. 26, 1998). Its analysis of Murdoch's Ex Post Facto Clause argument takes up almost four pages. *Id.* at 23-26. The Sixth Amendment isn't even mentioned.

The court of appeal's failure to discuss the Confrontation Clause is all the more conspicuous because its opinion addressed Murdoch's other arguments about Dinardo's testimony and the letter; almost a third of the opinion—nine pages—is devoted to these topics. *Id.* at 14-19. Four and a half of those are specifically devoted to Murdoch's complaint that the letter was improperly withheld. *Id.* at 14-19. But these pages are filled with discussions of California evidence law, the nature of the attorney-client privilege under California law and various state-law objections. None of the cases the court of appeal cites apply the correct Sixth Amendment standard or do the relevant analysis. The Federal Constitution isn't mentioned, the Confrontation Clause isn't mentioned and there's definitely no discussion of *Douglas*, *Davis*, *Vela* or *Mincey*.

If you wonder how this could have happened, just read the state's response brief in the court of appeal. Like the court of appeal's opinion, it cites neither *Vela* nor *Mincey*. The state nowhere engages Murdoch's Sixth Amendment claim or so much as mentions his Confrontation Clause arguments about the letter. Response Brief at 33-36, *Murdoch*, Nos. B100877+.

None of this could possibly be Murdoch's fault; he couldn't have done more to put the court of appeal on notice of his claim. Just look at the table of contents in his opening brief:

> XI. EVEN IF DINARDO'S LETTER WERE PRIV-
> ILEGED,   APPELLANT'S   5TH   AND   6TH
> AMENDMENT RIGHTS TO A FAIR TRIAL AND
> TO CONFRONT AND CROSS-EXAMINE THE
> CHIEF WITNESS AGAINST HIM WOULD TAKE
> PRECEDENCE OVER DINARDO'S ATTORNEY-
> CLIENT PRIVILEGE UNDER THE PARTICU-
> LAR FACTS OF THIS CASE

*Id.* at v. Murdoch's reply brief even tried to "respectfully redirect[ ] the Court's attention" to the sections of his opening

brief that set out his Confrontation Clause arguments, ones that the state's brief had overlooked. Reply Brief at 54-56 & n.17, *id.* Yet the court of appeal still decided his case without any discussion or acknowledgment of the Confrontation Clause.

We know they must have overlooked it, because California appellate courts can't intentionally skip over any claims: The California Constitution prohibits it. *See* 5 Cal. Jur. 3d *Appellate Review* § 706; *see also* Cal. Const. art. VI, § 14. To be sure, something as concise as "Defendant's remaining contentions do not merit discussion" will suffice. *See Lewis* v. *Superior Court*, 19 Cal.4th 1232, 1261-64 (1999); *People* v. *Rojas*, 118 Cal. App. 3d 278, 288-90 (Ct. App. 1981). But *something* must be said to indicate that the court is aware of the remaining issues and has resolved, rather than overlooked, them. The court of appeal in this case didn't include even a catch-all line and thus, according to state law, must be presumed to have overlooked the unaddressed issues.

It's not as though judges are immune from making this kind of mistake. *E.g.*, *United States* v. *California*, 558 F.2d 1347, 1353 (9th Cir. 1977) (noting on rehearing that "we overlooked" an argument made "in [the] briefs on appeal" ), *rev'd*, 438 U.S. 645 (1978); *George Pepperdine Found.* v. *Pepperdine*, 126 Cal. App. 2d 154, 163-64 (Ct. App. 1954) (noting on rehearing that, "[b]y inadvertence," the court had "neglected" to distinguish between two separate demurrers); *see also* Fed. R. App. P. 40(a)(2); 5 Cal. Jur. 3d *Appellate Review* § 723 (2009). Truth be told, it happens to all of us once in a while.

An oversight usually doesn't make a difference because issues insignificant enough to escape notice are often meritless. *See, e.g.*, *California*, 558 F.2d at 1353; *Pepperdine*, 126 Cal. App. 2d at 164. But Murdoch had a winning argument based on binding California case law interpreting the federal Confrontation Clause—an argument the state effectively con-

ceded by not responding to it. So, had the court of appeal actually thought about that claim, as it was required to, it would have had to grant relief or disregard one of its own cases (*Vela*) while figuring out some way to distinguish on-point precedent from the California Supreme Court (*Mincey*). Courts just don't do that kind of work in white ink.

Not California Courts of Appeal at any rate. The requirement that they show they "necessarily and carefully analyzed the contentions" in play is no mere formality. *Rojas*, 118 Cal. App. 3d at 290. They can be reversed for disregarding it. *See Amwest Sur. Ins. Co.* v. *Wilson*, 11 Cal.4th 1243, 1266-68 (1995). The California Supreme Court has called this requirement an "[i]mportant incident[ ] of the right to appeal," one that's "been in existence as to [the California Supreme Court] since the adoption of the state Constitution of 1879 and as to the Courts of Appeal since their creation in 1904." *People* v. *Medina*, 6 Cal.3d 484, 489, 490 n.5 (1972) (internal citations omitted). For us to presume that an unmentioned claim was rejected on the merits does not respect state law. It disdains it.

When a California court fails to mention a claim, at least in catch-all fashion, we can be sure that it didn't decide the claim. And there is absolutely no authority for the proposition that a totally unmentioned, and therefore undecided, claim can be deemed to have been "adjudicated on the merits" when state law would treat the claim as overlooked. *See, e.g.*, 16A *Federal Procedure* § 41:179 (L. ed., West 2010) ("In making the determination of whether an issue was 'adjudicated on the merits' in state court, the habeas court inquires into: (1) what state courts have done in similar cases . . . ."). The Supreme Court has held that when a state court declines to reach an issue because it erroneously concludes it need not, our review is *de novo. E.g.*, *Rompilla* v. *Beard*, 545 U.S. 374, 390 (2005); *Wiggins* v. *Smith*, 539 U.S. 510, 534 (2003). It makes no sense to treat an oversight born of negligence better than a mistake born of careful, if ultimately incorrect, reasoning.

**b.** This case exemplifies the problem with deferring to the sounds of silence. Had the court of appeal thought about Murdoch's claim, it would have realized that binding case law resolved the key issue in Murdoch's favor. Six years before Murdoch filed his appeal, the California Supreme Court held that a trial court erred in upholding an assertion of attorney-client privilege that conflicted with the Sixth Amendment. *Mincey*, 2 Cal.4th at 463-64. The facts of *Mincey* will sound familiar: A witness, implicated in the crime for which Mincey was convicted, testified pursuant to a cooperation agreement. The witness had communications with her attorney that, the defense believed, would cast doubt on her credibility at trial. The defense tried to question her about those statements, but she successfully asserted the attorney-client privilege. In those precise circumstances—where cross-examination as to attorney-client communications would have shed light on a witness's bias—the highest court in California held that the trial court erred in sustaining the privilege. It did so based on the Confrontation Clause. *Id.* at 463-64.

*Mincey* is one in a string of California cases to hold that the attorney-client privilege, a creature of the law of evidence, must yield to a defendant's right to effective cross-examination, a command of the Constitution. The next most striking example is *Vela*. There the trial court sustained an attorney-client privilege claim by "the very police officers whose trial testimony will be necessary to prove the criminal charges filed against the defendants." 208 Cal. App. 3d at 150. The court of appeal—including two members of Murdoch's panel—unanimously reversed, based on the Confrontation Clause. *Id.* at 151.

So, the times when the California courts have actually adjudicated claims like Murdoch's, i.e., when there's evidence they thought about the issue as in *Vela* and *Mincey*, they've decided that the Sixth Amendment requires exactly what Murdoch claims it requires. To reach the opposite conclusion as the state judges did in *Vela*, *Mincey*, etc., all in the name of

deference to those judges in *Murdoch*, does not show defer-
ence. Nor does it further "comity, finality, and federalism."
*Williams* v. *Taylor*, 529 U.S. 420, 436 (2000). It subverts
them.

**c.** When a state court doesn't decide a federal claim but we
defer nevertheless, a petitioner is stripped of his right to have
some court, any court, determine whether he's "in custody in
violation of the Constitution or laws or treaties of the United
States." 28 U.S.C. § 2241(c)(3). This upsets the "delicate bal-
ance" struck by AEDPA between vindicating the rights of
criminal defendants and upholding the authority of state
courts as the primary forum for adjudicating these rights. *Wil-
liams*, 529 U.S. at 436.

AEDPA vests the state courts with primary responsibility
for determining whether a prisoner's confinement violates the
Constitution. *See id.* When states accept this responsibility—
as evidenced by their adjudication of a petitioner's constitu-
tional claims on the merits—AEDPA requires us to accord
great deference. 28 U.S.C. § 2254(d). When states don't,
AEDPA deference doesn't apply and we must review the
claim *de novo*. *E.g.*, *Rompilla*, 545 U.S. at 390; *Wiggins*, 539
U.S. at 534.

This scheme preserves the essence of habeas review
announced in *Moore* v. *Dempsey*, 261 U.S. 86, 91-92 (1923)
(Holmes, J.), because it ensures that *some* court is open to
review the constitutionality of a petitioner's custody. But if a
federal court defers to a state that failed to decide a claim, *no*
court a prisoner may turn to will *ever* determine if his custody
actually violates the Constitution. By hypothesis the state
courts didn't, and our review will be limited to determining
whether there was an "unreasonable" constitutional error. *See*
*Delgado* v. *Lewis*, 223 F.3d 976, 981-82 (9th Cir. 2000).
That's probably why our colleagues in other circuits have
refused to defer in these circumstances, *Lyell* v. *Renico*, 470
F.3d 1177, 1182 (6th Cir. 2006) (Sutton, J.); *Canaan* v.

*McBride*, 395 F.3d 376, 382 (7th Cir. 2005) (D. Wood, J.); *Norde* v. *Keane*, 294 F.3d 401, 410 (2d Cir. 2002) (Miner, J.); *Gruning* v. *DiPaolo*, 311 F.3d 69, 71 & n.5 (1st Cir. 2002) (Torruella, J.); *Neill* v. *Gibson*, 278 F.3d 1044, 1053 (10th Cir. 2001) (Tacha, C.J.), and even less egregious ones, *Shelton* v. *Purkett*, 563 F.3d 404, 408-09 (8th Cir. 2009) (Beam, J.); *Henderson* v. *Cockrell*, 333 F.3d 592, 600-01 (5th Cir. 2003) (Jolly, J.); *Fortini* v. *Murphy*, 257 F.3d 39, 47 (1st Cir. 2001) (Boudin, C.J.); *Hameen* v. *Delaware*, 212 F.3d 226, 248 (3d Cir. 2000) (Greenberg, J.); *see also Bell* v. *Cone*, 543 U.S. 447, 460-61 (2005) (per curiam) (Ginsburg, J., concurring); *Chadwick* v. *Janecka*, 312 F.3d 597, 605-06 (3d Cir. 2002) (Alito, J.).

**2. Merits.** I would therefore decide Murdoch's Sixth Amendment claim *de novo*. Murdoch had no opportunity to cross-examine effectively the key prosecution witness about the primary issue regarding his credibility: whether he wrote a letter admitting that his testimony against Murdoch was coerced and untrue. This was not some remote inconsistency regarding a minor detail irrelevant to guilt or innocence; this went to the heart of the prosecution's case. Murdoch's Sixth Amendment rights were clearly violated. But I would rule for Murdoch even on the plurality's own terms, because it would have been an objectively "unreasonable application of . . . clearly established federal law . . . as determined by the Supreme Court" for the California courts to conclude otherwise. 28 U.S.C. § 2254(d)(1).

**a.** The plurality concludes that the supremacy of the Sixth Amendment over California's attorney-client privilege isn't "clearly established." Pl. op. at 9042. "There are few subjects," however, "upon which [the Supreme] Court and other courts have been more nearly unanimous than in their expressions of belief that the right of confrontation and cross-examination is an essential and fundamental requirement for the kind of fair trial which is this country's constitutional goal." *Pointer* v. *Texas*, 380 U.S. 400, 405 (1965).

In *Crawford* v. *Washington*, 541 U.S. 36 (2004), the Supreme Court held up the trial of Sir Walter Raleigh as an example of what the Sixth Amendment was supposed to prevent. Read Raleigh's fate and consider what's "clearly established" about the Sixth Amendment:

> The most notorious instances of civil-law examination occurred in the great political trials of the 16th and 17th centuries. One such was the 1603 trial of Sir Walter Raleigh for treason. Lord Cobham, Raleigh's alleged accomplice, had implicated him . . . . Raleigh argued that Cobham had lied to save himself: "Cobham is absolutely in the King's mercy; to excuse me cannot avail him; by accusing me he may hope for favour." . . . [D]espite Raleigh's protestations that he was being tried "by the Spanish Inquisition," the jury convicted, and Raleigh was sentenced to death.

> One of Raleigh's trial judges later lamented that " 'the justice of England has never been so degraded and injured as by the condemnation of Sir Walter Raleigh.' "

*Crawford*, 541 U.S. at 44 (citations omitted). This history is not part of the rule announced in *Crawford*. It long predates it. *See, e.g.*, *California* v. *Green*, 399 U.S. 149, 157 n.10 (1970).

So, if the Sixth Amendment has been clearly established to mean anything, it's that the Cobhams and Dinardos of the world—defendants who implicate others as accomplices to curry favor with the sovereign—must either be subject to rigorous cross-examination or stand mute before the jury. There is a "basic understanding that when one person accuses another of a crime under circumstances in which the declarant stands to gain by inculpating another, the accusation is presumptively suspect and must be subjected to the scrutiny of

cross-examination." *Lee* v. *Illinois*, 476 U.S. 530, 541 (1986). There is also a "basic understanding" that forcing a witness to confront and explain his prior statements that contradict his testimony is the gold standard for effective cross-examination. *See Harris* v. *New York*, 401 U.S. 222, 223-26 (1971). Nothing can deny a criminal defendant the right to have the government's key witness subject to this examination, certainly not "the vagaries of the rules of evidence." *Crawford*, 541 U.S. at 61. Not even a coordinate constitutional provision. *Harris*, 401 U.S. at 225-26.

**b.** The plurality stumbles into error because it never takes AEDPA's first step—identifying the fundamental legal principles announced in the Supreme Court's cases. Instead, the plurality treats the Supreme Court's Sixth Amendment jurisprudence like a series of unconnected contests between the right to confrontation and a particular rule of evidence: the Confrontation Clause v. the marital privilege; the Confrontation Clause v. the Fifth Amendment; the Confrontation Clause v. hearsay; etc. This way of looking at the Supreme Court's cases is myopic and wrong.

The Supreme Court uses cases with discrete facts to announce general principles. AEDPA instructs state courts to reasonably apply those principles, *see Williams* v. *Taylor*, 529 U.S. 362, 412 (2000), which the Court defines as the "*fundamental principles* established by [its] most relevant precedents." *Abdul-Kabir* v. *Quarterman*, 550 U.S. 233, 258 (2007) (emphasis added). "AEDPA does not require state and federal courts to wait for some nearly identical factual pattern before a legal rule must be applied." *Panetti* v. *Quarterman*, 551 U.S. 930, 953 (2007) (internal citations and quotation marks omitted); *see also Lockyer* v. *Andrade*, 538 U.S. 63, 76 (2003). The plurality's insistence that habeas petitioners produce a " 'spotted calf' on the precise issue at hand" has no foundation in law. *Bradley* v. *Duncan*, 315 F.3d 1091, 1101 (9th Cir. 2002).

When there's no case on point, AEDPA permits relief if "a state court either unreasonably extends a legal principle from [the Supreme Court's] precedent to a new context where it should not apply *or unreasonably refuses to extend that principle to a new context where it should apply*." *Williams*, 529 U.S. at 407 (emphasis added). All of the Court's Confrontation Clause jurisprudence points to one fundamental principle: Criminal defendants must be afforded the opportunity to effectively cross-examine the witnesses against them. *E.g.*, *Davis*, 415 U.S. at 316; *Pointer*, 380 U.S. at 405; *Douglas*, 380 U.S. at 418-20. That, and nothing else, is what needs to be "clearly established." *See Abdul-Kabir*, 550 U.S. at 258.

We can divine this "fundamental principle" solely from cases where a hearsay exception or court procedure prevented effective cross-examination, *e.g.*, *Lilly* v. *Virginia*, 527 U.S. 116 (1999); *Coy* v. *Iowa*, 487 U.S. 1012 (1988). *Williams* instructs us to reason analogically, and it would be unreasonable to refuse to extend the principle established in those cases to Murdoch's case. The right to cross-examination is "functional," and the harm to "reliability in . . . truth-finding," *Kentucky* v. *Stincer*, 482 U.S. 730, 737 (1987), caused by denying a defendant access to a prior inconsistent statement by the chief witness against him is far greater than the harm of allowing a witness to testify behind a screen. *Compare Coy*, 487 U.S. at 1020, *with Lee*, 476 U.S. at 541. *See also United States* v. *Mayans*, 17 F.3d 1174, 1184 (9th Cir. 1994); *Burr* v. *Sullivan*, 618 F.2d 583, 587 (9th Cir. 1980).

But we need not look afield. The Supreme Court has a specific category of Confrontation Clause cases that address "restrictions imposed by law or by the trial court on the scope of cross-examination." *Stincer*, 482 U.S. at 737 (internal quotation marks omitted). For example, the Court found a Confrontation Clause violation where "defense counsel was restricted by state confidentiality provisions from questioning a witness about his juvenile criminal record, although such evidence might have affected the witness' credibility." *Id.* at 738 (citing

*Davis*, 415 U.S. at 318). Even where the law that restricts cross-examination is a coordinate constitutional provision like the Fifth Amendment, admitting the witnesses' testimony while upholding the privilege violates the Confrontation Clause. *Douglas*, 380 U.S. at 420. The plurality cites no cases —because none exist—where the Supreme Court upheld the admission of testimony after a witness invoked a privilege that prevented "impeach[ment] by use of his earlier conflicting statements." *Harris*, 401 U.S. at 226. No such cases exist because "it is axiomatic that the defendant may employ the witness's prior inconsistent statements in order to impeach" the witness's testimony. *United States* v. *Adamson*, 291 F.3d 606, 612 (9th Cir. 2002).

The plurality's discussion of whether the attorney-client privilege is "worthy of greater protection" than a state's marital privilege, pl. op. at 9042, is utterly beside the point. Surely neither is of higher dignity than the Fifth Amendment privilege—the granddaddy of all evidentiary privileges— which nevertheless proved insufficient to overcome the Confrontation Clause in *Douglas*. 380 U.S. at 420. Even if the attorney-client privilege were of the same dignity as the Fifth Amendment, the need for "cross-examination and impeachment" would overcome it. *Harris*, 401 U.S. at 223-26. As in *Harris*, it's not an all-or-nothing proposition: Murdoch could have been allowed to cross-examine Dinardo based on the letter, but Dinardo could have been allowed to retain a species of use immunity, in that the letter could not then be used by the state against him in a criminal case. *See, e.g.*, *Bittaker* v. *Woodford*, 331 F.3d 715, 721-25 (9th Cir. 2003) (en banc); *see also People* v. *Hunter*, 2005 WL 1377738, at *10 (Cal. Ct. App. June 10, 2005) (Kline, J., concurring).

At any rate, this issue is much simpler than the plurality makes it out to be. Either an evidentiary privilege operates to deny an opportunity for effective cross-examination or it doesn't; if it does, the Sixth Amendment prohibits both giving effect to the privilege and admitting the witness's statements.

The privilege may yield or the witness may be excluded, but one or the other has to give. The bottom line is clearly established by a long line of Supreme Court cases: A witness may not testify against a defendant in a criminal trial if that witness cannot be cross-examined effectively.

*Swidler & Berlin* v. *United States*, 524 U.S. 399, 408 n.3 (1998), is nowhere to the contrary. The plurality relies on *Swidler*'s supposed "reservation" of a question about the attorney-client privilege as proof that the superiority of the Bill of Rights over California evidence law remains an open question. Obviously *Swidler* didn't make any such reservation. First, *Swidler* was a case about whether the attorney-client privilege survived the death of a client; it did not deal with a conflict between that privilege and anyone's constitutional rights. *Id.* at 401. Second, even the petitioner in *Swidler* conceded that the privilege could be breached when a criminal defendant's constitutional rights are implicated. *Id.* at 408 n.3. Third, the Supreme Court did not "reserve" a Sixth Amendment question for another day; the Court's opinion contains not a single word about the Confrontation Clause. The Court simply noted that it did not "need to reach" the far broader question of when the attorney-client privilege must yield in the face of a criminal defendant's constitutional rights at trial. *Id.*

But again, all this is beside the point. It doesn't matter if the attorney-client privilege turns out to be the Rock of Gibralter. If it is, the Supreme Court's cases teach that the testimony of the un-cross-examined witness can't come in. We know this from *Douglas*, which dealt with just such an inviolable privilege—the Fifth Amendment. 380 U.S. at 420. Nothing in *Swidler* calls this remedy into question, because *Swidler* dealt only with whether the privilege can be *breached*. The prosecutors there weren't trying to admit the privileged communications at trial; they were trying to learn of their contents in furtherance of an investigation.

**c.** These "fundamental principles" of the right to confrontation have not escaped other federal courts of appeals. The Second Circuit has held that "where assertion of the [attorney-client] privilege unduly restricts a defendant's cross-examination, the witness' direct testimony may have to be stricken." *United States* v. *Coven*, 662 F.2d 162, 170-71 (2d Cir. 1981). The Seventh Circuit has affirmed that "the right of confrontation conferred by the Sixth Amendment" can trump "[e]ven privileges recognized when the Constitution was written," *viz.*, the attorney-client privilege. *United States* v. *Rainone*, 32 F.3d 1203, 1206 (7th Cir. 1994). And the Eleventh Circuit thinks the same, having held in *Jenkins* v. *Wainwright* that "limitations on questioning" based on the attorney-client privilege are permissible only to the extent that the court "permit[s] cross-examination sufficiently thorough to satisfy the sixth amendment." 763 F.2d 1390, 1392 (11th Cir. 1985); *see also Mills* v. *Singletary*, 161 F.3d 1273, 1288 (11th Cir. 1998). Until the plurality wreaked havoc with our law, we were a comfortable member of this group. *Murdoch* v. *Castro*, 365 F.3d 699, 702 (9th Cir. 2004). Many state courts have also recognized that the attorney-client privilege may not prevent effective cross-examination. Most significant of these for our case is California, *see* pp. 9052-53 *supra*, but it is hardly alone, *see State* v. *Cascone*, 487 A.2d 186, 190-91 (Conn. 1985); *Neku* v. *United States*, 620 A.2d 259, 262-63 (D.C. 1993). The plurality ignores these voices by relying on a single footnote in an irrelevant Supreme Court case. If this is what the "clearly established law" test requires, then AEDPA did not limit habeas relief; it eliminated it.

**d.** The opportunity to cross-examine is particularly important when it can "expos[e] a witness' motivation in testifying." *Delaware* v. *Van Arsdall*, 475 U.S. 673, 678-79 (1986) (internal quotation marks omitted). It's all the more important when that witness is an accomplice cooperating with the government. *Lee*, 476 U.S. at 541; *see also Mayans*, 17 F.3d at 1184; *Burr*, 618 F.2d at 587. And *Van Arsdall* holds—it "clearly establishes"—that "cutting off all questioning about

an event that the State conceded had taken place and that a jury might reasonably have found furnished the witness a motive for favoring the prosecution in his testimony" violates a defendant's right to confront the witness. 475 U.S. at 679; *see also Adamson*, 291 F.3d at 612. '

Here, the state's star witness wrote a letter that, according to the prosecutor at trial, said "in sum and substance . . . that Mr. Dinardo was coerced by the police into implicating defendant Murdoch in this crime." **[TR 249]** "A reasonable jury might have received a significantly different impression of [Dinardo's] credibility" had they heard about it. *Van Arsdall*, 475 U.S. at 680. The trial judge denied Murdoch's jury the chance. That means Murdoch's Sixth Amendment right to confrontation was violated. *Id.*; *Davis*, 415 U.S. at 318. It would be unreasonable to conclude otherwise.

When there has been a Confrontation Clause error, we "cannot [consider] whether the witness' testimony would have been unchanged, or the jury's assessment unaltered, had there been confrontation; such an inquiry would obviously involve pure speculation." *Coy*, 487 U.S. at 1021-22. Harmlessness "must therefore be determined on the basis of the remaining evidence." *Id.* at 1022. Though the plurality purports not to reach this issue, there are rather large hints throughout the opinion that Murdoch's inability to cross-examine Dinardo was no big deal. Nothing could be farther from the truth.

Consider what the trial would have looked like sans Dinardo. Murdoch has always steadfastly maintained his innocence. No physical evidence has ever linked him to the crime. Four witnesses from the bar testified, but only three even vaguely recognized Murdoch. **[TR 604]** And they were highly equivocal. One patron said: "It's been 13 years. And I can't be positive." **[TR 625]** Another could only say that Murdoch looked "similar" to the gunman, because "it was so many years ago." **[TR 550, 579]** Though the plurality makes

much of the bartender's identification of Murdoch, pl. op. at 9029, she was shown Murdoch's picture in a photo array immediately after the robbery and didn't recognize him. **[TR 161]** More than a dozen years later, she points to the only defendant in the courtroom and is sure it's him. Weak tea. There was no way the prosecution could have gotten a conviction without a miracle called Dinardo.

But don't take my word for it; just see what the trial judge, who presided both over Murdoch's case and Dinardo's, has to say about it: "[U]nless the District Attorney has something more, I just wonder without [Dinardo's] assistance where they're going." Appendix at 9069. **[SER 363]** He notes that Murdoch's prosecutors "have a very difficult case without [Dinardo's] assistance." *Id.* **[SER 363]** That's why the judge wanted "to be able—that there would be some agreement that might be beneficial to Mr. Dinardo and the prosecution." *Id.* at 9068. **[SER 362]** Just in case this was too subtle to move Dinardo, the trial judge goes on to explain that he wants "to do something different," for Mr. Dinardo, rather than give him the "set sentence" the law required upon conviction for first degree murder. *Id.* at 9069. **[SER 363**] All of this was, as he acknowledged, "not the judge's province" and a matter "actually between attorneys." *Id.* **[SER 363]** But the trial judge also wanted Dinardo to know that "I have 90 days to change [your] sentence if anything changes in the way of your mind" about testifying against Murdoch. *Id.* **[SER 363]** Disgraceful.

Denying Murdoch the right to confront Dinardo cannot have been an error harmless beyond a reasonable doubt. If the state courts held otherwise—which they didn't—they unreasonably applied law clearly established by the Supreme Court.

**e.** The court of appeal did not decide Murdoch's constitutional claim, so it's unclear whether the harmless-error standard of *Brecht* v. *Abrahamson*, 507 U.S. 619, 631 (1993), applies in place of the *Chapman* standard. *See Fry* v. *Pliler*,

551 U.S. 112, 118-19 (2007). But it makes no difference. Just as it would be objectively unreasonable to conclude that the error in this case was harmless beyond a reasonable doubt, *see* pp. 9062-63 *supra*, it's obvious this error had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 631.

The plurality suggests that Murdoch "succeeded in eliciting testimony that challenged Dinardo's credibility as a witness," so any error couldn't have affected the jury's verdict. Pl. op. at 5. Even if that kind of argument could be made here, *but see Coy*, 487 U.S. at 1022, there's a huge difference between routine impeachment for bias and *specific* evidence that a witness has admitted that his trial testimony is untrue and a product of coercion from the get-go. The Supreme Court has long recognized the extraordinary effect that a witness's own inconsistent statement can have on a jury. In a case addressing confessions, the Court held that a defendant's own inconsistent statements are "probably the most probative and damaging evidence that can be admitted against him." *Arizona* v. *Fulminante*, 499 U.S. 279, 296 (1991) (internal quotation marks omitted). The same, of course, would have been true for Dinardo. The letter was nothing less than a confession that Dinardo had lied about the central matter of his testimony. No only that, but the letter would have explained *why* Dinardo was lying. It shows it wasn't just the trial judge's generous deal. The police had pressured him from the outset.

Plea bargains are cut every day and jurors know it. A letter like Dinardo's comes along once in a lifetime. As Judge Bright put it in his powerful dissent, "[t]he letter and its disavowal of Murdoch's involvement in the crime would have been the pièce de résistance, leading inextricably to the conclusion that Dinardo was not only generally unreliable but also untrustworthy regarding the one element of his testimony that the jury (as its verdict demonstrates) must have believed." *Murdoch*, 489 F.3d at 1071. "The concluding question on cross-examination of Dinardo seems obvious: 'Were you

lying then or are you lying now?' " *Id.* Forcing a witness to admit to the jury that he's a liar is the Holy Grail of cross-examination. What Murdoch got instead was a paper cup.

Surely there must be grave doubt whether the jury would have reached a different result if the letter had been admitted. Murdoch is entitled to a new trial so that cross-examination— the "greatest legal engine ever invented for the discovery of truth," *Green*, 399 U.S. at 158 (internal quotation marks omitted)—can be allowed to do its work.

**3. Procedural Default.** Judge Silverman agrees that Murdoch was denied his right to confrontation, but refuses relief because Murdoch's trial counsel "never sought to strike Dinardo's testimony." Concurrence at 9045. Judge Silverman doesn't contest that Murdoch argued on appeal that Dinardo's testimony should have been stricken. His problem with the timing of Murdoch's request must therefore sound in procedural default rather than exhaustion. In other words, Judge Silverman seems to think that, because Murdoch didn't move to exclude Dinardo's testimony at trial, his objection came too late—perhaps for failure to obey a contemporaneous objection rule or the like. State and federal law of procedural default belie such a claim.

As far as *Vela* reveals, Murdoch requested at trial precisely the remedy provided for under California law. Striking a witness's direct testimony isn't the *only* way California could have observed the Sixth Amendment's essential command. *Vela* holds as a matter of state law that, if necessary to permit effective cross-examination, California's attorney-client privilege "must give way." 208 Cal. App. 3d at 150. That's exactly what Murdoch asked for at trial.

I also doubt whether the California courts would have held Murdoch to any default, if default there was. California law says that "[a] defendant is not precluded from raising for the first time on appeal a claim asserting the deprivation of cer-

tain fundamental, constitutional rights." *People* v. *Vera*, 15 Cal.4th 269, 276-77 (1997); *see also People* v. *French*, 43 Cal.4th 36, 46-47 (2008). And even if the California courts would ordinarily have held that Murdoch's claim was procedurally defaulted, the trial judge's conduct in this case might have excused any default. *See People* v. *Hill*, 17 Cal.4th 800, 820-22 (1998). These uncertainties would make me think long and hard whether, if California would hold that Murdoch somehow procedurally defaulted his claim, that's an "independent and adequate" procedural bar to federal relief. *Cf. Townsend* v. *Knowles*, 562 F.3d 1200, 1207-08 (9th Cir. 2009). I would also have to consider whether Murdoch can excuse any default by showing cause and prejudice, particularly in light of the trial judge's conduct. *Cf. Cook* v. *Schriro*, 538 F.3d 1000, 1025-26 (9th Cir. 2008).

But I need not reach any of these difficult issues because procedural default is " 'an affirmative defense, and *the state has the burden* of showing that the default constitutes an adequate and independent ground' " for denying relief. *Scott* v. *Schriro*, 567 F.3d 573, 580 (9th Cir. 2009) (quoting *Insyxiengmay* v. *Morgan*, 403 F.3d 657, 665 (9th Cir. 2005)) (emphasis in original). California didn't argue to the district court, and it hasn't argued to us, that the state courts rejected Murdoch's Confrontation Clause claim on a procedural ground (or even that they should have). Nor has the state argued, as Judge Silverman would hold, that Murdoch was required to request exclusion of the witness at trial and that his failure to do so bars him from obtaining federal relief. That's the end of the road for any theory that Murdoch should be denied relief because he didn't ask for a particular remedy from the state trial court. *Chaker* v. *Crogan*, 428 F.3d 1215, 1220-21 (9th Cir. 2005). Habeas courts do not scour the record in search of every conceivable defect in a petitioner's presentation of a claim to the state courts. *Vela* is but one example of why: What we might require to preserve a claim is not always what the state courts would require. *Compare* Concurrence at 9044-45 *with Vela*, 208 Cal. App. 3d at 151.

California is satisfied with the procedural posture of this case. We are in no position to disagree.

\* \* \*

Today we become the only court in the country to hold that a state court may adjudicate a constitutional claim "on the merits" by overlooking it, and then have its carelessness rewarded with AEDPA's presumption that its adjudication was good enough for government work. We defer to a decision the state courts never made to reach a result that the state's highest court disagrees with. We fail to give effect to the plain meaning of the Confrontation Clause—one of the best-established principles of Anglo-American law—on the ground that it isn't "clearly established." Any one of these errors would be remarkable, but their combination produces a truly spectacular miscarriage of justice.

The purpose of AEDPA is to allow state courts to operate in good faith. So, in the ordinary case, when a defendant has an unbiased judge and the state courts take his constitutional claims seriously, we must defer even if we disagree on the merits. But this isn't an ordinary case. The state trial judge coerced a key witness into testifying and the state appellate judges never addressed the key claim on appeal. Cases like this are the reason federal habeas exists. When a federal constitutional claim falls through the cracks of a state's criminal justice system, federal courts must be there to catch it. No one else can. Charles Murdoch certainly deserved better from the California courts. Ultimately, though, it is we who surely did let him fall.

# Appendix

772

LONG BEACH, CALIFORNIA; WEDNESDAY, SEPTEMBER 20, 1995

P.M. SESSION

DEPARTMENT SOUTH K                HON. CHARLES D. SHELDON, JUDGE

(APPEARANCES AS HERETOFORE NOTED.)

(THE FOLLOWING PROCEEDINGS WERE HELD IN
OPEN COURT:)

THE COURT: MR. DINARDO IS BEFORE THE COURT. THE LAWYER IS HERE, TOO, MR. FULLER. MR. CARBAUGH IS HERE FOR THE PEOPLE.

WE HAVE CONTINUED THIS A NUMBER OF TIMES.

MR. FULLER: JUST ONE MOMENT, YOUR HONOR.

THE COURT: GO AHEAD.

(THE DEFENSE COUNSEL SPEAKS WITH HIS
CLIENT SOTTO VOCE.)

MR. FULLER: WE ARE READY TO PROCEED.

THE COURT: THIS COURT WOULD LIKE TO BE ABLE -- THAT THERE WOULD BE SOME AGREEMENT THAT MIGHT BE BENEFICIAL TO MR. DINARDO AND THE PROSECUTION, BUT WHAT I'VE HEARD INFORMALLY IS APPARENTLY WE'RE GOING FORTH WITH THE SENTENCING.

IS THAT TRUE, MR. FULLER?

MR. FULLER: YES, YOUR HONOR, THAT IS.

THE COURT: OKAY.

MR. CARBAUGH: AND I CAN SAY THE PEOPLE ARE READY FOR SENTENCING. I CAN ALSO SAY THAT MR. FULLER AND I HAVE HAD MANY DISCUSSIONS THAT I KNOW HE'S COMMUNICATED TO MR. DINARDO, AND MR. DINARDO HAS CHOSE TO PROCEED THE WAY

Page 1                                    362

775

PUTTING ME TO TRIAL. AND I BELIEVE IN LAW AND ORDER. AND THAT'S ABOUT IT.

THE COURT: WELL, AS I HAVE ALREADY INDICATED BY AN INDIRECT RESPONSE TO MR. FULLER, I WOULD LIKE TO DO SOMETHING DIFFERENT, MR. DINARDO. YOU'VE PROBABLY BEEN TOLD IT'S A SET SENTENCE. I HAVE TO GIVE IT. THE ONLY THING I CAN SAY IS I HAVE 90 DAYS TO CHANGE THE SENTENCE IF ANYTHING CHANGES IN THE WAY OF YOUR MIND OR THE DISTRICT ATTORNEY'S MIND INSOFAR AS TRYING TO RESOLVE THIS WITH SOMETHING LESS THAN THE SET SENTENCE.

FRANKLY, FROM THE STANDPOINT OF THE OTHER TRIAL, UNLESS THE DISTRICT ATTORNEY HAS SOMETHING MORE, I JUST WONDER WITHOUT YOUR ASSISTANCE WHERE THEY'RE GOING; BUT MAYBE SOMETIMES CASES DEVELOP AT THE LAST MINUTE. BUT, TO MY KNOWLEDGE, I DON'T KNOW OF ANY OTHER EVIDENCE. THEY HAVE A VERY DIFFICULT CASE WITHOUT YOUR ASSISTANCE.

BUT THAT'S ACTUALLY BETWEEN ATTORNEYS, AND IT'S NOT THE JUDGE'S PROVINCE.

I WAS HOPING THERE WOULD BE A RESOLUTION SO THAT I COULD SENTENCE YOU TO SOMETHING LESS, WHICH I WOULD PREFER TO DO FROM EVERYTHING ABOUT THIS CASE, ESPECIALLY THE LENGTH OF TIME AND ALL THE YEARS THAT YOU LIVED WHAT APPEARS TO BE A LAW-ABIDING LIFE BEFORE YOU GOT ARRESTED. UNFORTUNATELY FOR YOU, TECHNOLOGY HAS ADVANCED TO THE POINT WHERE YOU GOT ARRESTED WAY LATE IN THE GAME.

THE COURT MUST IMPOSE 25 YEARS TO LIFE FOR THE CONVICTION OF THE JURY. THAT'S WHAT I IMPOSE. I WILL STAY THE 12022 ALLEGATION. I THINK IT'S ONE YEAR. THAT STAY

Page 2

363

776

WILL BECOME PERMANENT WHEN YOU SERVE THE TERM THAT YOU ARE GOING TO HAVE TO SERVE UNLESS SOMETHING CHANGES IN THE NEXT 90 DAYS.

$200 RESTITUTION FINE. 13967 GOVERNMENT CODE.

WHEN YOU ARE RELEASED ON PAROLE, ANY VIOLATION OF TERMS AND CONDITIONS OF PAROLE OR ANY LAW, YOU COULD GO BACK TO PRISON FOR ADDITIONAL TIME DURING THE TIME YOU ARE ON PAROLE.

ADDITIONALLY, IF YOU WANT TO APPEAL THE CONVICTION, THE SENTENCE OR BOTH, DON'T HAVE THE MONEY TO DO SO, AN ATTORNEY WILL BE APPOINTED FOR YOU TO FILE THE APPEAL BETWEEN NOW AND 60 DAYS FROM NOW. AND APPLY FOR AN ATTORNEY, IF YOU WANT ONE, TO THE DISTRICT COURT OF APPEALS.

MR. FULLER: YOUR HONOR, SO THE RECORD IS COMPLETE, I AM AT THIS TIME FILING A NOTICE OF APPEAL WITH THIS COURT.

THE COURT: THANK YOU.

WE NEED A LOT OF CREDITS. HAVE YOU FIGURED THEM?

MR. FULLER: NO, YOUR HONOR, BUT I CAN FIGURE THEM IN 30 SECONDS.

THE COURT: TELL THE CLERK WHEN YOU DO THEM, AND SEE IF MR. CARBAUGH AGREES; AND THOSE WILL BE THE CREDITS.

MR. CARBAUGH: THANK YOU, YOUR HONOR.

(PROCEEDINGS CONCLUDED.)

364

Page 3

THOMAS, Circuit Judge, with whom MCKEOWN, Circuit Judge, joins, dissenting:

As Judge Tashima has pointed out, the California Court of Appeal referenced Murdoch's Confrontation Clause argument in its decision and discussed the attorney-client privilege in quoting *People v. Godlewski*, 21 Cal. Rptr.2d 796, 800 (Ct. App. 1993). Assuming, *arguendo*, that the last reasoned state court opinion decided the Confrontation Clause argument on the merits, and that our review is therefore not *de novo*, I would still conclude that Murdoch is entitled to federal habeas relief.

For the reasons articulated by Chief Judge Kozinski, the California Court of Appeal decision was an objectively unreasonable application of clearly established federal law, as determined by the Supreme Court of the United States in a long series of cases, including *Crawford v. Washington*, 541 U.S. 36 (2004), *Davis v. Alaska*, 415 U.S. 308 (1974), and *Douglas v. Alabama*, 380 U.S. 415 (1965). Thus, I join parts 2(a)-(e) and part 3 of Chief Judge Kozinski's dissent.