[No. B055480. Second Dist., Div. Four. Aug. 5, 1993.]

THE PEOPLE, Plaintiff and Respondent, v.
RAYMOND E. GODLEWSKI et al., Defendants and Appellants.

**[Opinion certified for partial publication.\*]**

---

*Pursuant to California Rules of Court, rules 976 and 976.1, this opinion is certified for partial publication. The portions directed to be published are: Statement of Facts, The Trial Court Properly Excluded Statements Godlewski Made to His Lawyer, and Disposition.

942

COUNSEL

Stephen Temko and Christopher Blake, under appointments by the Court of Appeal, and Dennis A. Fischer for Defendants and Appellants.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Carol Wendelin Pollack, Assistant Attorney General, Donald E. de Nicola and David F. Glassman, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

VOGEL (C. S.), J.—

*Statement of Facts*

Three defendants appeal following their convictions for murder. As none of the defendants directly raises a sufficiency of the evidence claim, we will briefly summarize, in accord with the traditional rule of appellate review (*People* v. *Johnson* (1980) 26 Cal.3d 557, 562 [162 Cal.Rptr. 431, 606 P.2d 738, 16 A.L.R.4th 1255]), the operative events of this murder-for-hire case. Additional facts will be set forth as necessary to evaluate the specific assignments of error.

Raymond E. Godlewski, desiring to kill his father, hired Gene Flack to commit the crime. Flack enlisted Michael Brown's assistance. At approximately 12:30 a.m. on July 4, 1989, Brown drove Flack to the victim's home in Sylmar. Flack knocked on the door. When the victim answered, Flack murdered him with a single shotgun blast to the head. Brown drove Flack from the scene.

On July 5, 1989, Flack told Paul Caines that he had committed the murder. Caines notified the police. The police interviewed Flack and Brown but released them. Several days later, the police arrested Godlewski and Brown. Flack fled to Louisiana but was soon apprehended.

The three men were jointly charged and tried. However, one jury was impanelled for Brown and Flack while another jury was impanelled for

Godlewski. At certain points, each jury was excluded during portions of the People's case although both juries heard all of the defense evidence.

Godlewski testified and admitted hiring Flack to kill his father. He asserted that he had done so because of a lifetime of physical and emotional abuse suffered at his father's hands. Additionally, he claimed he was fearful of his father because of threats he had made shortly before his death. The jury apparently credited Godlewski's claim to a certain extent because, although charged with first degree murder with the special circumstance allegation of murder for financial gain, he was convicted only of second degree murder.

Flack testified and denied having committed the murder. He admitted only that he had purchased a shotgun for Godlewski. Flack claimed that it was Godlewski who actually shot the victim. The jury disbelieved Flack and found him guilty of first degree murder and found true the special circumstance allegation of murder for financial gain.

Brown did not testify and presented no defense. Essentially, he argued that the People's circumstantial evidence case against him did not establish guilt beyond a reasonable doubt. The jury disagreed and found him guilty of first degree murder. (The special circumstance allegation against Brown had been stricken before trial at the request of the People.)

. . . . . . . . . . . . . . . . . . . . . . . . . . .*

### The Trial Court Properly Excluded Statements Godlewski Made to His Lawyer

Flack contends that prejudicial error occurred because the trial court ruled inadmissible, based upon the attorney-client privilege, statements made by Godlewski to his lawyer. Flack characterizes the statements as an admission by Godlewski that he (Godlewski), not Flack, actually committed the murder.

The issue arose during trial. Flack proposed to call as a witness Steve White, a county jail inmate, who allegedly overheard a conversation between Godlewski and his lawyer in the "lockup" on the day of Godlewski's arraignment in the superior court. Flack's offer of proof consisted of a written statement prepared by Flack's investigator, who had spoken with White. White apparently signed the statement under penalty of perjury. Flack did not offer the statement into evidence. Instead, he read it to the court as follows:

*See footnote, *ante*, page 940.

"The statement by the witness was that he heard the attorney say 'You would have been better off saying that you did it instead of blaming it on these guys.

" 'Then Ray [Godlewski] said, 'You are right. That's what I'm going to tell them, that I did it, not these guys.'

" 'The attorney then said, 'You got yourself in deeper trouble and are going to have to straighten it out.'

" 'Ray [Godlewski] said he talked to Gene [Flack's] grandmother this morning and she said not to have someone else go down for something they didn't do.' "

Godlewski asserted the attorney-client privilege. Flack responded that the privilege had been waived because the conversation had taken place in the presence of a third person (White). The court found no waiver[25] and sustained the assertion of the privilege.[26]

Several days later, Flack renewed his motion to permit White to testify. Arguing that the evidence was so significant to his case that its exclusion would deny him a right to a fair trial, he asked the court to engage in a balancing process in deciding whether or not to uphold the claim of privilege. To explain the importance of White's proposed testimony, Flack pointed to the following testimony given by Flack's grandmother (Emma Baugh) and mother (Elizabeth McLemore).

Baugh had testified that during a phone conversation with Flack placed from the county jail following the defendants' arrests, Flack had another man come to the phone. The individual identified himself as "Ray, Jr." He admitted that he had personally killed the victim, and promised to exonerate Flack and Brown. Baugh conceded she did not recognize the voice, and Godlewski, in his subsequent testimony, denied Baugh's allegations about the conversation.

---

[25]The court stated, in part: "Now all counsel realizes how the lockups are here, that there are holding cells and then there are little seats, cubicles, in which the attorney is on one side of a mesh screen, strike that, the defendant would be on the other side. The fact that there are other people in the holding cell, and understanding there is just no other place to have an attorney-client conversation, I don't feel that the person, because a person engages in such conversation, is deemed a waiver of the privilege. Had the person, the defendant, talked to other suspects outside an attorney conference that would be another story."

[26]Flack thereafter argued that there was no evidence that Godlewski had been speaking to his attorney. The court then conducted a brief in camera hearing with Godlewski's counsel, following which it reiterated its ruling upholding the privilege. We have reviewed the sealed transcript of that hearing and conclude that it contains substantial evidence to uphold the trial court's finding that no waiver of the attorney-client privilege occurred.

Likewise, McLemore testified that during a phone conversation with Flack, Flack brought a man he identified as "Ray" to the phone. McLemore did not recognize the voice. However, "Ray's" "confession" to McLemore was different from the one allegedly given to Baugh in that "Ray" told her that he had *accidentally* killed his father.

Flack urged that White's testimony was necessary to corroborate the phone conversations to which Baugh and McLemore had testified. Flack also renewed his earlier argument that Godlewski had waived the privilege by conversing with counsel in the "lockup." Flack averred that law enforcement personnel and criminal defense attorneys had told him that there was a policy that if a lawyer asked to speak to a client in private, the request would be accommodated. Flack offered to call these individuals as witnesses if the court so desired. Godlewski did not quarrel with the existence of the policy but noted that practically, there is neither the time nor the opportunity to arrange for such private interviews.

Last, Flack proposed that Godlewski's rights could be accommodated by permitting White to testify only in front of the Flack-Brown jury. With that procedure, the Godlewski jury would never learn of the statement. Godlewski had earlier rejected this "offer."

The court again denied Flack's request. It found that the attorney-client privilege was an integral part of the federal constitutional right to counsel and that the privilege should be liberally construed. It rejected the option of disclosing the statement only to the Flack-Brown jury. However, the court did grant Flack's request to preclude the People from arguing to the jury that there was no corroboration for the testimony of either Baugh or McLemore.

■ Flack now contends that the trial court erred in barring White's testimony. We disagree, for we conclude that only the most extraordinary circumstance would justify disclosure of privileged communications between lawyer and client and that Flack failed to make that showing.

■ The attorney-client privilege, albeit a statutory one, is the oldest of the confidential communications privileges. (*Sullivan* v. *Superior Court* (1972) 29 Cal.App.3d 64, 71 [105 Cal.Rptr. 241].) Its purpose is to safeguard the confidential relationship between a client and counsel so as to promote full and open disclosure of facts and tactics surrounding the case. (*People* v. *Flores* (1977) 71 Cal.App.3d 559 [139 Cal.Rptr. 546].) These benefits justify the risk that an unjust decision may sometime result because the privilege suppresses relevant evidence. (*People* v. *Canfield* (1974) 12 Cal.3d 699, 705 [117 Cal.Rptr. 81, 527 P.2d 633].) In the context of

condemning governmental conduct which had invaded the attorney-client relationship, our Supreme Court held that the attorney-client privilege helps to implement the accused's constitutional right to effective representation because "if an accused is to derive the full benefits of his right to counsel, he must have the assurance of confidentiality and privacy of communication with his attorney." (*Barber* v. *Municipal Court* (1979) 24 Cal.3d 742, 751 [157 Cal.Rptr. 658, 598 P.2d 818]; see also *Neku* v. *U.S.* (D.C. 1993) 620 A.2d 259, 262 ["In the criminal context the privilege acquires Sixth Amendment protection. [Citation.]"].)

Given this policy framework, it is not surprising that the California courts have not yet embraced Flack's position. In *People* v. *Flores, supra,* 71 Cal.App.3d 559, an accomplice, testifying pursuant to a grant of immunity, gave the "most damning" (*id.* at p. 565) evidence against the defendant. The defense sought to cross-examine the accomplice about discussions he had with his attorney prior to the grant of immunity. The trial court barred the questioning after the witness invoked the attorney-client privilege. On appeal, the defendant "in his argument against the use of the attorney-client privilege, contend[ed] that fundamental principles of social justice demand that help be extended by the courts in such circumstance to protect a defendant from a possible conviction predicated upon the biased and self-serving testimony of a witness." (*Id.* at pp. 564-565.)

The Court of Appeal rejected the request to breach the privilege. "The privilege of confidential communication between client and attorney should not only be liberally construed, but must be regarded as sacred. Courts should not whittle away at the privilege upon slight or equivocal circumstances. The grant of immunity and [the accomplice's] testimony admitting his complicity in the crime are not facts of such compelling force to require a waiver of the confidential nature of the attorney-client communication; its confidentiality must be kept inviolate. [Citations.]" (71 Cal.App.3d at p. 565.)

This division adopted a similar analysis in *Littlefield* v. *Superior Court* (1982) 136 Cal.App.3d 477 [186 Cal.Rptr. 368] (hg. den.). That writ proceeding arose out of the "Hillside Strangler" prosecution against Angelo Buono. The People's primary witness was Kenneth Bianchi. The People had originally jointly charged Bianchi with Buono but Bianchi agreed to plead guilty in exchange for testifying against Buono. Buono asserted that Bianchi's inculpating testimony was falsely given to escape the risk of capital punishment and thus sought to cross-examine Bianchi about his conversations with his counsel which led to the plea bargain. Buono's theory was that Bianchi's counsel had disclosed facts to Bianchi about the murders which enabled Bianchi to fabricate his testimony against Buono. We held, in part:

"Assuming that the evidence would show that the public defender had done so, in counseling Bianchi about the wisdom of the plea bargain (a fact that Buono's counsel can only surmise), we see nothing to permit a violation of the traditional attorney-client privilege." (*Id.* at p. 481.)

*Littlefield* was followed in *People v. Johnson* (1989) 47 Cal.3d 1194, 1228 [255 Cal.Rptr. 569, 767 P.2d 1047], where the California Supreme Court rejected a defendant's claim that he had been denied due process by the trial court's ruling that the attorney-client privilege precluded most of the questions posed to an accomplice who testified as part of a plea bargain.

Thus, it is patent that the attorney-client privilege is not one to be easily discarded merely because a defendant asserts that invocation of the privilege results in the denial of his right to a fair trial. In an effort to avoid the force of these authorities, Flack relies upon cases which have adopted a balancing approach to decide whether or not the attorney-client privilege should yield to the accused's right to confront and cross-examine.

In *United States ex rel. Blackwell v. Franzen* (7th Cir. 1982) 688 F.2d 496, the People's only occurrence witness was the defendant's accomplice, who had entered into a plea bargain with the prosecutor. Defense cross-examination of the accomplice explored the terms of the plea bargain in an attempt to show a motive to fabricate. On redirect, the People rehabilitated the accomplice through a statement he had given to the police inculpating the defendant before the prosecutor had made any promises to him. On recross-examination, the defense sought to examine the accomplice about a statement he had made to his attorney in which he allegedly claimed that the prior consistent statement had been the fruit of police coercion. The trial court sustained the objection that the statement to counsel was protected by the attorney-client privilege. On appeal, the state court rejected the defense claim of error. In a subsequent federal habeas corpus proceeding, the district court found that the limitation placed on the defense cross-examination of the accomplice violated the constitutional right to confront and cross-examine. The Court of Appeals reversed that portion of the district court's holding. Noting the general principle that the right to confront and cross-examine is not an absolute right " 'and may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process' " (*id.* at p. 500, citing *Chambers v. Mississippi* (1973) 410 U.S. 284, 295 [35 L.Ed.2d 297, 309, 93 S.Ct. 1038]), it formulated the pertinent inquiry as follows: "The court must ultimately decide whether the probative value of the alleged privileged communication was such that the defendant's right to effective cross-examination was substantially diminished." (688 F.2d at p. 501.) Because defense counsel was otherwise given wide latitude in exploring the

issue of the accomplice's credibility, the Court of Appeals concluded that the invocation of the attorney-client privilege had not prejudiced the defendant's right to cross-examine the state's principal witness.

The District of Columbia Court of Appeals applied *Blackwell*'s approach in *Neku* v. *U.S.*, *supra*, 620 A.2d 259. There, after observing the defendant obtain cocaine from Carter, an undercover officer purchased cocaine from the defendant. Both defendant and Carter were arrested. Before trial, Carter pled guilty to obtain sentencing benefits. Carter and the undercover officer testified against the defendant at his trial. The defendant sought to call Carter's former attorney to testify to prior inconsistent statements Carter had made to counsel which would allegedly impeach Carter's inculpatory trial testimony. The trial court sustained the objection that the statements were protected by the attorney-client privilege.

Relying upon *Blackwell*, the appellate court upheld the trial court's ruling. It reasoned that the value of the privileged communication "must be clear and substantial" to outweigh the interests served by the privilege. (620 A.2d at p. 263.) Essential to that determination are both the intrinsic probative value of the information conveyed by the privileged communication and the alternative means open to the accused to otherwise make the same point. (*Ibid.*) The *Neku* court concluded, after a careful review of the record, that the probative value of the proffered impeachment was inadequate to outweigh the interests protected by the attorney-client privilege, given the other methods available to impeach Carter. (*Id.* at p. 264.)

We do not believe that either *Blackwell* or *Neku* supports Flack's contention that the trial court erred in not permitting White's testimony about Godlewski's comments to counsel. Both cases are clearly distinguishable, in that each involved an attempt to breach the attorney-client privilege held by an accomplice who had already pled guilty; at bench, Flack seeks to penetrate the confidential attorney-client relationship of a codefendant who is being jointly tried. There is a great potential for mischief inherent in a case such as this where codefendants are jointly tried but each attempts to shift responsibility to the other. Moreover, as the *Neku* court itself noted, there is a valid concern that if the privilege is easily breached by a defendant, "the price may be to open up to view entire discussions between attorney and criminal defendant as the prosecutor in turn fairly seeks" to use privileged communications. (*Neku* v. *U.S.*, *supra*, 620 A.2d at p. 262.)

In any event, neither case holds that the defendant has a per se right to breach the attorney-client privilege in order to present a defense. The most which can be distilled from the two cases is that a criminal defendant *may*,

under certain circumstances, have the right to use privileged communications. To make that determination, a court must employ a balancing process to decide if a breach of the privilege is necessary to implement the accused's constitutional rights.[27]

In both *Neku* and *Blackwell*, the trial and appellate courts found that the balance tilted in favor of sustaining the privilege. In fact, Flack has not cited any case in which a court has concluded that the balance weighed in favor of overriding the attorney-client privilege and disclosing the information at trial. Thus, the only question in this case is whether employment of a balancing process required overriding the privilege so as to permit White's testimony. We think not.

---

[27]Flack also relies upon several California cases to support his claim that the attorney-client privilege should yield to his right to a fair trial. The cases are distinguishable for several reasons and, in any event, add nothing to the analyses found in *Neku* and *Blackwell*.

First, none of the cases involved disclosure of a statement made by a codefendant jointly charged and prosecuted. Instead, the cases raise issues about discovery of information about a victim or a witness.

Second, most of the cases involved assertion of a privilege other than the attorney-client privilege. (*Rubio* v. *Superior Court* (1988) 202 Cal.App.3d 1343 [249 Cal.Rptr. 419] [defendant sought videotape in possession of the victim's parents, who asserted confidential marital communications privilege and constitutional right to privacy]; *People* v. *Boyette* (1988) 201 Cal.App.3d 1527 [247 Cal.Rptr. 795] [defendant sought disclosure of medical and psychiatric records of eyewitness to determine witness's competency and credibility]; *People* v. *Reber* (1986) 177 Cal.App.3d 523 [223 Cal.Rptr. 139] [defendant sought disclosure of victim's psychiatric records].)

Third, in the one case involving an assertion of the attorney-client privilege, the privilege was raised by the employer of the victims. In *Vela* v. *Superior Court* (1989) 208 Cal.App.3d 141 [255 Cal.Rptr. 921], the defendants were charged with committing crimes upon Culver City police officers. The police officers had made statements to counsel for Culver City for defense against potential civil actions arising out of the crimes. The defense sought discovery of those statements. Culver City asserted the attorney-client privilege. The Court of Appeal concluded that because Culver City was attempting "to protect from disclosure written statements of the very police officers whose trial testimony will be necessary to prove the criminal charges filed against the defendants[,] . . . adherence to a statutory attorney-client privilege must give way to pretrial access when it would deprive a defendant of his constitutional rights of confrontation and cross-examination." (*Id.* at pp. 150-151.) Thus, because the privilege was asserted not by a *codefendant* but by the employer of the victims of the crimes, the *Vela* court had no reason to even consider the extent to which such disclosure could impact upon a codefendant's constitutional right to competent representation.

In any event, even were we to assume that, taken together, these cases stand for the proposition that the attorney-client privilege of a codefendant can be overridden in some situations, none of the cases hold that disclosure is automatic. That is, because a balancing process is the touchstone of the analysis, the appellate courts have only required the trial court to determine, after conducting an in camera review of the privileged matter, if disclosure of the privileged matter is essential to ensure a defendant's right to a fair trial. (*Vela* v. *Superior Court, supra*, 208 Cal.App.3d at p. 151; *Rubio* v. *Superior Court, supra*, 202 Cal.App.3d at p. 1350; and *People* v. *Boyette, supra*, 201 Cal.App.3d at p. 1534.) This approach is consistent with the conclusions reached in *Neku* and *Blackwell*. For the reasons we will explain, the balance in the present case weighs in favor of upholding the privilege.

In regard to that prong of the determination which necessitates evaluating the "intrinsic probative weight" (*Neku* v. *U.S.*, *supra*, 620 A.2d at p. 263) of the proffered testimony, Flack greatly overstates his case when he claims that in the statements Godlewski "admitted guilt and exonerated his codefendants." Godlewski only stated, in response to a statement by counsel that he "would have been better off saying" that he had done it instead of blaming it on Flack and Brown, "That's what I'm going to tell them, that I did it, not these guys." This conversation merely suggests that as a matter of trial tactics, Godlewski was going to assert he had done the killing. The conversation contains no affirmative representation by Godlewski that, in fact, he actually did do the killing.

In regard to that prong of the determination which calls for evaluating "the availability of other means by which the defendant can pursue" the same point (*Neku* v. *U.S.*, *supra*, 620 A.2d at p. 263), the record discloses that Flack did, in fact, present other evidence to support his claim that Godlewski had admitted having actually committed the murder. Two witnesses (Baugh and McLemore) testified that "Ray" admitted that he had killed the victim. Flack's argument that White's testimony was necessary to corroborate their testimony overlooks two significant points. One is that the trial court prevented the prosecutor from taking unfair advantage of its ruling sustaining the privilege by ruling that he could not argue that there was no corroboration for the testimony of Baugh and McLemore. The second, and more significant, is that Flack, in the course of his trial testimony, twice recounted a conversation with Godlewski in which the latter confessed to him that he had accidentally shot his father.[28]

Given Flack's testimony that Godlewski said that he had *accidentally* shot the victim, an incredible claim in light of all of the other evidence in this case,[29] we conclude that, on balance, Flack has not demonstrated a compelling need for the use of the statements. A fortiori, the trial court did not err.[30]

---

[28]Flack testified: "[H]e [Godlewski] said that he got a threatening phone call from his dad on the 3rd of July night and that he had taken the gun that I had sold him and went to his dad's house and that when his dad answered the door his dad started yelling at him and he went to grab the gun from Ray and the gun went off and hit him in the face. Then after he realized he killed his father he got scared and left the gun in the front yard and went back to his house."

[29]Flack seems to have implicitly recognized the inherent improbability of the thesis that Godlewski shot his father because he gave that theory brief mention in closing argument and really used it only to argue reasonable doubt.

[30]Following the jury's verdict, Flack renewed this claim in his motion for a new trial. The trial court denied the motion.

. . . . . . . . . . . . . . . . . . . . . . . . . . . .*

*Disposition*

The judgment entered against Gene E. Flack is modified to reflect that he shall receive 232 days of conduct credits to be applied against the determinate 2-year portion of his sentence; the trial court shall prepare and forward an amended abstract of judgment to the Department of Corrections reflecting this modification. In all other respects, the judgments are affirmed.

Woods (A. M.), P. J., and Epstein, J., concurred.

Appellants' petitions for review by the Supreme Court were denied October 21, 1993.

---

*See footnote, *ante*, page 940.