Filed 8/11/15  P. v. Pulido CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H039370 |
| Plaintiff and Respondent, | (Monterey County Super. Ct. No. SS090535) |
| v. | |
| JUAN PULIDO, | |
| Defendant and Appellant. | |

Defendant Juan Pulido was convicted by jury trial of first degree murder (Pen. Code, § 187, subd. (a)),[1] shooting at an inhabited dwelling (§ 246), attempted murder (§§ 187, subd. (a), 664), assault with a firearm (§ 245, subd. (a)(2)), two counts of active participation in a criminal street gang (§ 186.22, subd. (a)), and aggravated assault (§ 245, subd. (a)(1)).  The jury also found true gang (§ 186.22, subd. (b)) and firearm (§ 12022.53, subds. (c), (d)) allegations.[2]  Defendant was committed to state prison to serve a 28-year determinate term and a consecutive indeterminate term of 50 years to life.

Defendant contends on appeal that the judgment must be reversed because (1) his trial counsel was not permitted to elicit testimony from his accomplice about the

---

[1]     Subsequent statutory references are to the Penal Code unless otherwise specified.

[2]     The jury found not true the premeditation allegation attached to the attempted murder count.

accomplice's discussions with the accomplice's attorney about their negotiations for a plea agreement, (2) the accomplice corroboration instruction was inadequate, (3) the court's instructions on false statements and false testimony were not "balanced," (4) the court gave conflicting instructions on malice, (5) defendant's trial counsel was prejudicially deficient in failing to request a limiting instruction as to evidence of the accomplice's guilty plea, and (6) the court erroneously upheld the prosecution's section 1054.7 requests for nondisclosure of information.   We affirm the judgment.

## I.  Factual Background

A member of the Salinas Acosta Plaza criminal street gang, a Norteño gang, was shot in May 2008.  In gang culture, a gang will be "ridiculed" if it does not retaliate when one of its members is shot.  Acosta Plaza gang members wanted to retaliate for the May 2008 shooting.[3]  Acosta Plaza gang members believed that a "big" Sureno lived on Lewis Circle in Salinas.

On November 2, 2008, a woman named Andrea, who owned a white BMW, drove defendant, his cousin Jorgé Alejandro Fernandez, and another woman named Andrea Johnson from Salinas to a football game in Oakland.  Fernandez was an associate of the Acosta Plaza gang and had been "hanging out" with Acosta Plaza gang members for a couple of months.  Fernandez was drinking on the way to the game and after the game.[4]  Defendant was also drinking and used some cocaine.  On their way back from the game, Fernandez received a cell phone call for defendant from an Acosta Plaza gang member.

---

[3]   The primary activities of the Acosta Plaza gang include murder and attempted murder.

[4]   Andrea testified that Fernandez was not drunk at any point, but Fernandez testified that he was "really drunk" as they drove home.

2

Fernandez handed his phone to defendant. Fernandez heard defendant say "'Don't trip. I'll handle it.'"

Fernandez fell asleep during the drive back to Salinas. When they got back to Salinas, defendant told Andrea to take them to Acosta Plaza, a street in Salinas that is the location of the Acosta Plaza apartment complex, the "main hangout area" for the Acosta Plaza gang. At Acosta Plaza, defendant got out of the car for a while and then returned. Defendant directed Andrea to another neighborhood in Salinas and had her park her car on London Way, which was near Lewis Circle. Defendant and Fernandez got out of the car, and the two women remained in the car. Defendant and Fernandez were both wearing T-shirts and jeans, and defendant, who was taller and heavier than Fernandez, was wearing a black beanie.

By this point, it was about 10:00 p.m. The two men went to a home on Lewis Circle, and Fernandez knocked on the front door.[5] The victim, who was referred to as "Little Joe" at trial, lived in this home with his parents and his four younger siblings, including his brother Fabian. Little Joe had a history of associating with Sureño gang members. Little Joe's mother opened the door and found Fernandez on her porch. Fernandez, who was a stranger to Little Joe's mother, asked if Fabian was there. Little Joe's mother inquired "'what do you want him for'" and asked Fernandez for his name. Fernandez said his name was "Alex." Little Joe's mother closed the door and went upstairs to ask Fabian and Little Joe if they knew someone named Alex. Fabian told her that he did not know anyone named Alex. Little Joe said "let me go check who it is." Although Little Joe's mother said that she would "tell him you're not here," Little Joe said "let me just go look."

---

[5] Acosta Plaza gang members believed that a particular white van had been involved in the May 2008 shooting. Two weeks after November 2, 2008, a white van that looked like that van was parked in the driveway of the home on Lewis Circle where the shooting had taken place.

Little Joe went downstairs, opened the door, stepped out, and closed the door behind him.  Little Joe's mother remained just inside the door, and she saw that Fernandez was on a walkway past a pillar in front of the house when Little Joe stepped out.  She heard a series of about five gunshots and opened the door.  Little Joe ran back into the house and fell to the floor.  He had been struck by bullets in his chest and armpit.  Little Joe's mother ran out the door and saw Fernandez and a taller man standing in her neighbor's yard facing each other and doing something with their hands.  She yelled at them, and Fernandez turned toward her and began shooting at her.  She ran back into her house.  Little Joe died from his wounds.

A neighbor on Lewis Circle heard two series of gunshots, opened his front door, and looked out.  He saw two young men running away from the scene of the shooting.  One of the men was "kind of husky," and the other man was "medium to slight build."

John Doe, who lived on nearby London Way, also heard the gunshots.  He looked out his upstairs bedroom window and saw two men run toward a parked white BMW and get into it.  Doe had "a bird's-eye view" from his window and could see the faces and bodies of the men.  The men appeared to be wearing white T-shirts and black beanies.  One of the two men was "a lot thicker and bigger" than the other man.  The bigger man was "linebacker size," six feet two or three inches tall, and 260 pounds.  Doe "was focusing" on the bigger man, and his "mind took a mental photo" of this man.  The bigger man got into the backseat behind the driver, and the smaller man got into the backseat on the passenger's side.  After the men got into the car, the car left the area.

A minute after defendant and Fernandez left the car, Andrea heard two series of gunshots separated by a pause.  After the gunshots, Andrea saw Fernandez and defendant running back to the car.  Defendant got into the backseat of the car behind the driver, and Fernandez got into the passenger seat.  Fernandez told Andrea "'Go, go.'"  Fernandez said "'I think I got him,'" and defendant said "'I know I got him.'"  Andrea drove them

back to Acosta Plaza, and Fernandez and defendant got out of the car there and ran into the apartment complex.

The police responded to the shooting and found a beer can in the gutter near where Andrea's BMW had been parked on London Way. Fernandez's fingerprints were found on the beer can. A birthday card from Andrea's mother to Andrea was also found at that location. The police contacted Andrea in January 2009, and she told them what had happened on November 2, 2008.[6] Fernandez was arrested in January 2009. Defendant turned himself in to the police in January 2009.

Doe spoke to the police shortly after the shooting and again several weeks after the shooting. He told the police that "he got a good look at [the bigger man's] face" and he thought he would be able to identify him if he saw him again. He had a "vivid memory" of the bigger man. He described the bigger man as six feet two inches tall and around 250 pounds. In September 2009, 10 months after the shooting, Doe identified defendant in a photo lineup as the bigger man he had seen that night.[7] He "was 90 percent or more sure that it was the guy."

Although Fernandez and defendant were not housed together in jail, in February 2011 they were accidentally left together after being transported back from a court appearance. An alleged sex offender was also accidentally left with them. Fernandez and defendant knew that the man was an alleged sex offender because he wore a green wristband. The Acosta Plaza gang had a policy of requiring gang members to attack a sex offender if the opportunity arose. After defendant and Fernandez were unshackled, defendant told Fernandez that he was going to attack the alleged sex offender. Both

---

[6] There was no discussion of Andrea being placed in the witness relocation program until after she had told the police what had happened that night.

[7] At the trial, four years after the shooting, Doe was not able to make a courtroom identification of defendant as the bigger man. As the trial court noted, defendant's appearance had changed significantly in the four years between his arrest and the trial.

defendant and Fernandez then attacked the alleged sex offender and repeatedly punched him in the head.

In February 2011 and March 2011, notes were found in defendant's cell. One of these notes listed the Norteño gang's rules. Its presence in his cell demonstrated that he was a member of the Norteño gang. In September 2012, defendant gave Fernandez a note suggesting that they needed to get their stories "straight" and "iron out any wrinkles." In his note, defendant said "I think we got a good chance for a hung jury."

## II. Procedural Background

Defendant and Fernandez were originally jointly charged by information with all of the offenses other than the gang counts and the aggravated assault count, which were alleged only as to defendant. However, in September 2012, Fernandez agreed to plead guilty to the murder and attempted murder counts and testify against defendant.

Defendant testified on his own behalf at trial. He claimed that he had been dropped off at his home as soon as they got back to Salinas from Oakland on November 2, 2008. He denied receiving any phone calls after the game. Defendant testified that he went to sleep as soon as he got home. He knew nothing about the shooting until he learned in January 2009 that he was wanted for murder. He turned himself in the next day.

Defendant admitted that he associated with Norteño gang members, but he denied that he was a gang member. He also admitted that he had committed the February 2011 assault. He said he did so because "I have a dislike for rapist" due to something that had happened to a family member. Defendant denied that there was any gang motivation for that assault. Defendant admitted that he had given Fernandez a note. He explained that this note "was more like if he could help me out because, I mean, he knows I haven't been involved in this. . . . I would appreciate help if you help me out. You know, I've been innocent from the start."

6

Defendant's trial counsel argued to the jury that the prosecution's case was based on "a shoddy, questionable identification by Mr. John Doe" and "two questionable self-interested witnesses [Andrea and Fernandez] who are getting a package deal out of this thing."

## III. Discussion

### A. Attorney-Client Testimony

Defendant claims that the trial court prejudicially erred in "preclud[ing] inquiry" of Fernandez "about conversations with his own lawyer during the plea negotiation process." He asserts that such questioning was "vitally important" so that defendant could "fully explore [Fernandez's] motive and expectations for testifying."

#### 1. Background

Fernandez was arrested two months after the shooting. He originally told the police that he had been dropped off before the shooting occurred and knew nothing about the shooting. In July 2012, Fernandez asked his attorney to contact the prosecution and try to obtain a "deal" based on information that Fernandez could provide about another cousin who was also facing murder charges in an unrelated case. Fernandez had information that this other cousin had committed an additional murder. Fernandez, who believed he was facing 75 years to life, hoped to obtain a "deal" for something less than a life sentence.

Fernandez first spoke to the prosecutor in July 2012. The prosecutor told Fernandez that he would have to also testify against defendant. Fernandez met with the prosecutor twice more about the other cousin's case and then twice about defendant's case. He did not admit his role in the November 2008 shooting until his second interview with the prosecution. In early September 2012, Fernandez began providing information to the prosecution about the November 2008 shooting. Fernandez originally told the

prosecution that he had done nothing wrong and that defendant had fired all of the shots. He admitted at trial that his original statements to the prosecutor were lies.

Just before Fernandez entered into a plea agreement in September 2012, defendant gave Fernandez a note stating that they "needed to get our stories straight." A few days later, Fernandez agreed to testify against both defendant and his other cousin. The written plea agreement, which was in evidence at trial, required Fernandez to testify truthfully in the prosecutions of both defendant and his other cousin. Under this plea agreement, Fernandez pleaded guilty to murder and attempted murder and admitted a gang allegation as to the murder count in exchange for a sentence of 15 years to life and a concurrent or consecutive term of as much as nine years. Fernandez testified on cross-examination that he had "hope" that he would be released from prison in 11 years.

Fernandez testified at trial as a prosecution witness and explained the chronology of his initial lies, subsequent attempts to obtain a deal, and eventual agreement to testify.[8] He claimed that his memory of the night of the shooting was "choppy" because he was "really drunk." Fernandez insisted that defendant was the one in charge that night. After they got out of Andrea's car on London Way, defendant told Fernandez "'you're going to ask for some fool named Fabian.'" Fernandez knew that there was speculation that a "big" Sureno lived on Lewis Circle.

Fernandez testified that, when Little Joe came out of the house on Lewis Circle, Little Joe came toward Fernandez "in an aggressive manner" and said "'Yeah, fool. What's up?'" Fernandez claimed that he was "still drunk" at the time of the shooting, and he did not know that defendant had a gun until defendant started shooting. He testified that defendant shot Little Joe at close range by putting the gun to Little Joe's "stomach area" and firing four times. Fernandez provided an explanation for his subsequent possession of the gun. He testified that, after defendant shot Little Joe, he and

---

[8] Fernandez also testified as an expert on the Acosta Plaza gang.

defendant both ran but "bumped into each other" on the neighbor's lawn, and defendant handed Fernandez the gun. Fernandez claimed that he then ran back and shot twice at a shadow in the doorway. He and defendant then ran back to the car. Fernandez testified that defendant got into the back seat behind the passenger's seat well before Fernandez reached the car, and Fernandez got into the front passenger's seat. Inside the car, Fernandez testified that he said "'I think I got him.'"

During cross-examination of Fernandez at trial about his initial decision to seek a deal based on information about his other cousin, defendant's trial counsel asked: "Well, was there back-and-forth discussions -- your attorney came and gave you their answer, and then you asked for something, you know, and the -- did you and your attorney go back and forth to try and identify the areas of what you wanted to talk about?" The prosecutor objected to this question on the ground that it "[c]alls for privileged information." The court sustained the objection and stated: "I'm excluding conversations. I'm only -- the objection was sustained only as to the conversation between him and his attorney, not to conversation between him and his attorney that other people attended." Defendant's trial counsel continued to extensively question Fernandez about his negotiations with the prosecution and the plea agreement.

The defense theory at trial was that Fernandez had been the only person involved in the shooting. "[Defendant] wasn't even there." Defendant's trial counsel argued to the jury that Fernandez had a "gigantic incentive . . . to come in and say whatever he wants about [defendant]" because he hoped to get out of prison in 11 years. "And, don't forget, he's the one that sought the deal. The prosecutor didn't go to him and say, 'Hey, you want to deal with us?' No. He sought the deal. He sent his attorney. He negotiated for a couple of months . . . ." "The deal is because the guy is a proven killer. And he's getting away with it. And he'll be out in 11 years. [¶] Who else gets out in 11 years for killing somebody? Nobody. And this was his only chance. He was looking at so much dark time in the future that he was never going to get out." "[H]e gives testimony that benefits

9

him, helps him with his deal.  Can't be proven either way.  And he expects you to swallow it lock, stock and barrel."  "You know that Alex is a liar.  You know that he's a murderer."

## 2.  Analysis

Defendant's trial counsel attempted to ask Fernandez if there were "back and forth" discussions between Fernandez and his attorney during which Fernandez "asked for something" and the two of them tried to "identify the areas" that Fernandez was willing to disclose to the prosecution.  Defendant insists that by sustaining the prosecutor's objection to this single question on privilege grounds the trial court improperly precluded his trial counsel from inquiring into Fernandez's "motive and expectations for testifying" and thereby violated his confrontation rights.

Defendant premises his claim on several federal cases, which are not binding on us.  (*People v. Bradley* (1969) 1 Cal.3d 80, 86.)  The California Supreme Court's holdings, which do bind us (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455), provide no support for his contention.  In *People v. Johnson* (1989) 47 Cal.3d 1194 (*Johnson*), the California Supreme Court rejected the claim that a defendant's due process rights permitted him to invade the attorney-client privilege to attack on cross-examination the credibility of the testimony of a prosecution witness who was the defendant's accomplice and testified as part of a plea bargain.  (*Johnson*, at p. 1228.)  In *People v. Gurule* (2002) 28 Cal.4th 557 (*Gurule*), the California Supreme Court rejected a claim based on due process and the confrontation clause that the defense was entitled to pretrial access to confidential communications between a prosecution witness and his attorney.  (*Gurule*, at p. 594.)

Defendant claims that *Gurule* is inapposite because it concerned only pretrial disclosure of privileged information.  But *Gurule* clearly was not limited to the pretrial disclosure context as it relied on *Johnson*, which, like the case before us, concerned cross-examination at trial.  While defendant attempts to distinguish *Johnson*, his

10

arguments are unsuccessful. While it is true that *Johnson* involved a due process claim, not a confrontation clause claim, *Gurule*, which relied on *Johnson* was a confrontation clause claim and found no basis for distinguishing *Johnson*. The fact that *Johnson* is from 1989 is immaterial as it was reaffirmed by *Gurule* in 2002. The fact that evidence was admitted in *Johnson* of *unprivileged* conversations between the witness and his attorney does not distinguish it from this case. Fernandez testified extensively about unprivileged statements made during plea negotiations.

Defendant's attempts to identify California authority that supports his position are also unsuccessful. The Court of Appeal in *People v. Godlewski* (1993) 17 Cal.App.4th 940 (*Godlewski*) did not hold that the defense had a right to invade the attorney-client privilege but instead *assumed* that there could be circumstances under which such an invasion was warranted and found no basis permitting such an invasion in the case before it. (*Godlewski*, at pp. 948-950 & fn. 27.) The Court of Appeal's assertion in *Vela v. Superior Court* (1989) 208 Cal.App.3d 141 (*Vela*) that a criminal defendant has a right to pretrial access to statements protected by the attorney-client privilege directly conflicts with the California Supreme Court's holding in *Gurule* and therefore cannot be relied upon. (See *People v. Petronella* (2013) 218 Cal.App.4th 945, 960 [*Vela* based on cases that are "no longer the law."].)

In any event, the trial court's ruling was not an abuse of discretion. Defendant acknowledges that a trial court has discretion to limit the extent of cross-examination, but he argues that the trial court's ruling was not a proper limit on the extent of cross-examination but an unconstitutional preclusion of any cross-examination in a relevant area. The record demonstrates otherwise. Defendant's trial counsel was not precluded from extensively cross-examining Fernandez about the plea agreement, his motivations for seeking it, his negotiations with the prosecution regarding it, and his expectations concerning the benefit he would obtain from it. There is no indication in the record that Fernandez's disclosure of his conversations with his attorney about what he was seeking

11

from, and offering to, the prosecution would have added anything of significant relevance regarding Fernandez's "motive and expectations for testifying" given the extensive testimony elicited from Fernandez on this subject.

"'Generally speaking, the Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.'" (*People v. Wilson* (2008) 44 Cal.4th 758, 794.) "A trial court's limitation on cross-examination pertaining to the credibility of a witness does not violate the confrontation clause unless a reasonable jury might have received a significantly different impression of the witness's credibility had the excluded cross-examination been permitted." (*People v. Quartermain* (1997) 16 Cal.4th 600, 623-624.)

On the record before us, there is no indication that the jury would have been given a "significantly different impression" of Fernandez's credibility if only he had been required to testify about his conversations with his own attorney. Defendant argues that we cannot uphold the court's ruling as a proper exercise of discretion because the court made a "blanket" ruling and failed to apply a balancing test. He assumes that, because the court upheld the prosecutor's objection on privilege grounds, the court "applied the wrong standard" and failed to exercise any discretion. His assertion that "nothing in the record suggests" that the court exercised discretion ignores the basic rule that we apply on appeal. Where the record does not indicate the trial court's rationale, we presume that the trial court acted properly. (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 564.) Here, the trial court's statements on the record did not affirmatively indicate whether it utilized a balancing test in upholding the prosecutor's privilege objection, but neither did the court's statements indicate that the court did not. We therefore presume that the trial court exercised its discretion in ruling on this objection. As we find no abuse of discretion, we reject defendant's challenge to the trial court's ruling on the prosecutor's privilege objection.

Defendant also claims that his trial counsel was prejudicially deficient in failing to seek an in camera hearing to determine the admissibility of Fernandez's conversations with his attorney. When a defendant challenges his conviction based on a claim of ineffective assistance of counsel, he must prove that counsel's performance was deficient and that his defense was prejudiced by those deficiencies. (*People v. Ledesma* (1987) 43 Cal.3d 171, 218; *Strickland v. Washington* (1984) 466 U.S. 668, 687 (*Strickland*).) "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (*Strickland*, at p. 694.) Whenever counsel's conduct can be reasonably attributed to sound strategy, a reviewing court will presume that the conduct was the result of a competent tactical decision, and defendant must overcome that presumption to establish ineffective assistance. (*Strickland*, at p. 689)

Defendant makes no attempt to establish that, even if his trial counsel had succeeded in obtaining an in camera hearing and even if the trial court had permitted the cross-examination that was sought, "the result of the proceeding would have been different." Hence, he cannot establish that any deficiency by his attorney in failing to request an in camera hearing was prejudicial and cannot prevail on his ineffective assistance claim.

Defendant nevertheless asks us to remand for an in camera hearing. He cites no authority for doing so under these circumstances where the appellate claim is ineffective assistance of counsel. Both of the cases he cites involved trial court error, not ineffective assistance. In *Pennsylvania v. Ritchie* (1987) 480 U.S. 39 (*Ritchie*), the defendant sought pretrial disclosure of confidential records of a child protection agency's investigation of the sexual abuse allegations against the defendant. (*Ritchie*, at p. 43.) The trial court did not examine the records but denied the request for disclosure. (*Ritchie*, at p. 44.) The Pennsylvania Supreme Court reversed the defendant's subsequent conviction and held that the defendant was entitled to disclosure of all of the records in the agency's file.

13

(*Ritchie*, at p. 46.) The United States Supreme Court's plurality opinion directed that, on remand, the trial court should review the records in camera and determine whether there was information that would have changed the outcome of the trial. (*Ritchie*, at pp. 58-59.) *People v. Caplan* (1987) 193 Cal.App.3d 543 was similar. While there may be a basis for a limited remand for an in camera hearing in a case where the trial court has erred in failing to conduct, or improperly conducting, an in camera review, no authority exists for such a remand where the claim on appeal is ineffective assistance in failing to seek an in camera hearing.

## B. Corroboration Instruction

Defendant claims that the trial court prejudicially erred in failing to include both testimony *and statements* in the corroboration instruction[9] because there was testimony by John Coletti, the prosecutor's investigator, about Fernandez's pretrial statement that defendant had committed the murder. Defendant's opening appellate brief cites to a page of the reporter's transcript on which Coletti did give such testimony. However, this

---

[9] The court told the jury that Fernandez "is an accomplice." "You may not convict the defendant, Juan Pulido, of . . . Counts 1 through 7 based upon the testimony of [Fernandez] . . . alone. You may use the testimony of an accomplice to convict the defendant only if the accomplice's testimony is supported by other evidence that you believe; two, the supporting evidence is independent of the accomplice's testimony; and three, the supporting evidence tends to connect the defendant to the commission of those crimes. [¶] Supporting evidence, however, may be slight. It does not need to be enough by itself to prove that the defendant is guilty of the charged crimes, and it does not need to support every fact mentioned by the accomplice in the statement or about which the accomplice testified. [¶] On the other hand, it is not enough if the supporting evidence merely shows that a crime was committed or the circumstances of its commission. The supporting evidence must tend to connect the defendant to the commission of the crime. [¶] The evidence needed to support the testimony of one accomplice cannot be provided by the testimony of another accomplice. Any testimony of an accomplice that tends to incriminate the defendant should be viewed with caution. You may not, however, arbitrarily disregard it. You should give the testimony the weight you think it deserves after examining it with care and caution in the light of all the other evidence."

14

testimony occurred during an in limine hearing outside the jury's presence. When Coletti testified before the jury, he gave no testimony about Fernandez's pretrial statements. Consequently, there was no prosecution evidence other than Fernandez's own testimony before the jury of pretrial "statements" of Fernandez to which the corroboration instruction applied. Since the corroboration instruction already applied to Fernandez's testimony, the trial court did not err in failing to include a reference to "statements" in the instruction.[10]

## C. Instructions on False Statements and False Testimony

Defendant contends that the trial court violated his due process rights by instructing the jury that it could infer that defendant was "aware of his guilt" if it found that he knowingly made false or misleading statements or "tried to create false evidence or obtain false testimony." He does not contend that these standard pattern instructions were legally incorrect. Defendant argues that they violated his rights because the court did not *also* tell the jury that evidence that defendant had promptly turned himself in when he learned that he was being sought by the police "support[ed] an inference of innocence . . . ." Defendant argues that these instructions were erroneous because "[t]he constitution requires instructional equality between the state and the defense."

The court instructed the jury: "If the defendant made a false or misleading statement before his trial relating to the charged crime knowing the statement was false or tending to mislead that conduct may [show] he was aware of his guilt of the crime and you may consider it in determining his guilt. [¶] If you conclude that the defendant made

---

[10] We pointed out appellate counsel's error to him and permitted him to submit supplemental briefing on this point. He forthrightly admits his error but claims that the instruction still was required to expressly reference "statements." Since the jury could not have misunderstood the need for corroboration of everything to which Fernandez testified, the court's failure to include "statements" in the instruction was not erroneous.

the statement, it's up to you to decide its meaning and importance. However, evidence that the defendant made such a statement cannot prove guilt by itself." "If the defendant tried to create false evidence or obtain false testimony that conduct may show that he was aware of his guilt. If you conclude that the defendant made such an attempt, it is up to you to decide its meaning and importance. However, evidence of such an attempt cannot prove guilt by itself." Defendant did not request any modifications to these instructions nor did he request any additional instructions.

Defendant's trial counsel objected to these instructions on the ground that they were not warranted by the evidence and therefore would be "misleading to the jury," but he does not claim on appeal that these legally correct instructions were not supported by the evidence. His appellate contention is solely that *these instructions* were not "balanced" because they did not *also* instruct the jury on defense evidence that could have supported a contrary inference.

Defendant may not pursue this contention on appeal because he failed to raise it below. "A party may not complain on appeal that an instruction correct in law and responsive to the evidence was too general or *incomplete* unless the party has requested appropriate clarifying or amplifying language." (*People v. Lang* (1989) 49 Cal.3d 991, 1024, italics added.) Defendant does not claim on appeal that the instructions he now challenges were legally incorrect or unresponsive to the evidence. His appellate contention is that these instructions were incomplete because they failed to address defense evidence that could have led to a contrary inference. Such a contention may not be raised for the first time on appeal.

Defendant's reliance on *Cool v. United States* (1972) 409 U.S. 100 (*Cool*) is misplaced. In *Cool*, an accomplice testified in support of the defense. However, over the objections of the defense, the trial court instructed the jury that it could consider the testimony of the accomplice only if the jury determined that this testimony was true beyond a reasonable doubt. (*Cool*, at pp. 100-102.) The United States Supreme Court

16

concluded that the instruction was unconstitutional because it "impermissibly obstruct[ed]" the jury's consideration of exculpatory evidence. (*Cool*, at p. 104.)

Unlike the instructions challenged by defendant, the instruction in *Cool* was *not* "correct in the law and responsive to the evidence." It was legally *in*correct because defense evidence need not surmount a beyond-a-reasonable-doubt proof barrier in order to be considered by the jury. A legally incorrect instruction need not be challenged below, but a legally correct instruction that is responsive to the evidence may not be challenged on appeal on the ground that it is incomplete unless a request for modification was made below. Defendant's failure to do so bars consideration of his contention on appeal.

Defendant's claim that "unequal standards" were applied to the parties by the trial court lacks any basis in the record. Since defendant did not request the instruction that he now claims should have been given, the trial court had no opportunity to rule on its propriety. It obviously did not reject such a request. Hence, there is no indication that the trial court failed to act impartially as to the parties' instructional requests.

### D. Malice Instructions

Defendant claims that the trial court prejudicially erred in giving the jury an improper definition of malice.

The jury was given an instruction identifying, first, the "crimes and allegations requir[ing] general criminal intent," which included "Shooting at an inhabited dwelling," and, second, those "requir[ing] a specific intent or mental state," which included "Murder" and "attempted murder." This instruction told the jury that, as to the specific intent crimes and allegations, "[f]or you to find a person guilty of these crimes or to find the allegations true that person must not only intentionally commit the prohibited act, but must do so with a specific intent or mental state. The act and the specific intent and

17

mental state required *are explained in the instruction for that crime* or allegations." (Italics added.)

The murder instruction (CALCRIM No. 520) properly instructed the jury on the malice element of murder. For each other offense, the court gave a separate instruction on its elements. An element of the shooting at an inhabited dwelling count is that the perpetrator "*maliciously* and willfully discharge a firearm . . . ." (§ 246, italics added.) The shooting at an inhabited dwelling instruction included the following sentence in the middle of the instruction: "Someone acts *maliciously* when he or she intentionally does a wrongful act or when he or she acts with the intent to disturb, defraud, annoy or injure someone else." (Italics added.) Neither the oral nor the written instructions on the murder offense were in close proximity to the instruction on the shooting at an inhabited dwelling offense. The prosecutor's argument to the jury regarding the murder count confirmed that the "malice aforethought" element explained in the murder instruction was the one that applied to the murder count.

Defendant claims that the trial court erred in failing to "specifically tell the jury what malice definitions applied to what crimes." No such failure occurred. The trial court expressly instructed the jury, as to the murder count, that "the specific intent and mental state required *are explained in the instruction for that crime* . . . ." This instruction unambiguously told the jury where to find the applicable malice definition for the murder count.

Defendant cites *People v. Shade* (1986) 185 Cal.App.3d 711, *People v. Chavez* (1951) 37 Cal.2d 656 and *People v. Price* (1965) 63 Cal.2d 370, but those cases are inapposite. In those cases, the challenged definition of malice was erroneously given *in connection with a murder count* rather than properly given in connection with some other count. (*Shade* at p. 714 [only charge was murder]; *Chavez* at pp. 666-667 [murder prosecution]; *Price* at p. 372 [murder, robbery and theft prosecution].) Furthermore, in each of these three cases, the court concluded that the erroneous definition of malice was

18

not prejudicial because the jury was also instructed on the correct definition of malice aforethought.  (*Shade* at pp. 714-715; *Chavez* at pp. 666-667; *Price* at p. 374.)

"[An] instruction 'may not be judged in artificial isolation,' but must be considered in the context of the instructions as a whole and the trial record.  [Citation.]  In addition, in reviewing [a potentially] ambiguous instruction such as the one at issue here, we inquire 'whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way' that violates the Constitution."  (*Estelle v. McGuire* (1991) 502 U.S. 62, 72.)  To the extent that there was any room for ambiguity in the instructions, the trial court's express direction to the jury to use the mental state definition in the murder instruction eliminated any possibility that the jury would instead utilize the challenged sentence in the shooting at an inhabited dwelling instruction.  We find no error.

### E.  Ineffective Assistance of Counsel

Defendant contends that his trial counsel was prejudicially deficient in failing to request a limiting instruction telling the jury that "it could not also use [Fernandez's] guilty plea to infer [defendant's] guilt of the same charged offenses."

Defendant cites and relies on a host of cases involving nontestifying codefendants.  These cases concerned the absence of an opportunity for confrontation, which is not at issue here as Fernandez testified at trial.

Defendant primarily relies on *United States v. Halbert* (9th Cir. 1981) 640 F.2d 1000 (*Halbert*).  In *Halbert*, two codefendants pleaded guilty and testified against Halbert at his conspiracy trial.  (*Halbert*, at p. 1004.)  Halbert challenged his conviction on the ground that his codefendants' guilty pleas should not have been disclosed to the jury.  (*Ibid.*)  The Ninth Circuit Court of Appeals noted that a guilty plea was not admissible as evidence of the defendant's substantive guilt but was admissible on the issue of the codefendant's credibility.  (*Ibid.*)  While the admission of the evidence was therefore

19

proper, the Ninth Circuit reversed because the trial court had failed to give a proper limiting instruction. (*Halbert*, at p. 1006.) The district court had told the jury that the "disposition of [the codefendants] . . . should not control or influence you in your verdict with reference to the remaining defendant, Mr. Halbert. You must base your verdict as to him solely on the evidence presented to you in this courtroom." (*Ibid.*) The Ninth Circuit found this instruction inadequate because it did not tell the jury "in unequivocal language that the plea may not be considered as evidence of a defendant's guilt" but "only as evidence of [the codefendants'] credibility." (*Halbert*, at pp. 1006-1007.)

In California, trial courts generally have no obligation to give sua sponte limiting instructions. (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1051.) *Halbert*'s holding that a sua sponte limiting instruction is required where evidence of a testifying codefendant's guilty plea is admitted into evidence does not apply here. As the California Supreme Court observed in *People v. Williams* (2013) 56 Cal.4th 630 (*Williams*), where the defense does not object to the admission of evidence of the guilty plea but instead "incorporate[s]" it into the defense case, a trial court has no obligation to give a limiting instruction. (*Williams*, at p. 668.) That was the case here. The defense at trial was that Fernandez was the sole perpetrator of the November 2008 shooting, and the defense argued that he was lying because he was guilty of these crimes and wished to cast off some of the blame onto defendant.

Furthermore, the jury instructions explicitly informed the jury of the appropriate limited use it could make of this evidence. The court told the jury: "If you find that a witness has committed a crime or other misconduct you may consider that fact *only* in evaluating the credibility of the witness's testimony." (Italics added.) In this context, we must presume that the decision of defendant's trial counsel, who was relying heavily on Fernandez's guilt to discredit his testimony, to decline to seek any further limiting instruction was a sound strategy aimed at permitting the jury the broadest possible use of Fernandez's guilty plea *against Fernandez*. (*Strickland*, *supra*, 466 U.S. at p. 689) "A

20

reasonable attorney may have tactically concluded that the risk of a limiting instruction . . . outweighed the questionable benefits such instruction would provide." (*People v. Maury* (2003) 30 Cal.4th 342, 394.) Defendant's ineffective assistance claim cannot succeed on appeal.[11]

## F. Disclosure Under Section 1054.7

The trial court held a series of in camera hearings concerning the prosecutor's requests for nondisclosure under section 1054.7. Statutorily required disclosures may be "denied, restricted, or deferred" for "good cause." (§ 1054.7.) "'Good cause' is limited to threats or possible danger to the safety of a victim or witness, possible loss or destruction of evidence, or possible compromise of other investigations by law enforcement. [¶] Upon the request of any party, the court may permit a showing of good cause for the denial or regulation of disclosures, or any portion of that showing, to be made in camera." (§ 1054.7.)

Defendant asks this court to review the records of these in camera hearings to determine whether the trial court precluded disclosure of any information that would have assisted the defense. We have reviewed the records of these in camera hearings. We find that the trial court did not err in granting the prosecution's requests and that the defense was not deprived of any material and relevant information that would have assisted the defense.

## IV. Disposition

The judgment is affirmed.

---

[11] Defendant argues that the alleged errors were cumulatively prejudicial. As we have not identified multiple errors, there is no prejudice to cumulate.

21

_____
Mihara, J.

WE CONCUR:


_____
Elia, Acting P. J.


_____
Bamattre-Manoukian, J.